Argued May 11, reversed October 19, 1960

# STATE OF OREGON *v.* JACKSON
### 356 P. 2d 495

338

*Robert J. McCrea,* Deputy District Attorney for Lane County, Eugene, argued the cause for appellant. With him on the brief was William F. Frye, District Attorney for Lane County, Eugene.

*Stanley Fleishman,* Los Angeles, California, and *Bruce R. Avrit,* Eugene, argued the cause for respond-

ent. On the brief were Ramstead and Avrit, Eugene, and Brock, Fleishman & Rykoff, Los Angeles, California.

Before McAllister, Chief Justice, and Rossman, Warner, Perry, Sloan, O'Connell and Millard, Justices.

ROSSMAN, J.

This appeal tests the constitutionality of the Oregon obscenity statute, ORS 167.150. On March 31, 1958, the grand jury for Lane County returned an indictment charging the defendant with a violation of the act, reciting that he did "wilfully and unlawfully sell, distribute and possess with intent to sell and distribute" a book entitled "The Strange Three." The indictment describes the book as follows:

> "* * * said book as an entirety being indecent and obscene, tending to incite lascivious thoughts and tending to arouse lustful desires * * *."

It will be noticed that the indictment charges that the defendant acted "wilfully." *Wong v. City of Astoria,* 13 Or 538, 11 P 295, held that "wilfully" is equivalent in its connotation to knowingly. That definition has been adhered to ever since *Falls v. Mortensen,* 207 Or 130, 295 P2d 182.

At the trial, before evidence was taken, the defendant renewed a demurrer filed earlier, challenging the indictment on the ground that the act violates Article I, Sections 8 and 11, of the Oregon Constitution and the Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States. The trial judge sustained the demurrer, and from the resulting judgment the state appeals.

ORS 167.150 is divided into five sections. Although the indictment charges a violation of only the first, the entire statute is set out below:

"Any person who:

"(1) Imports, designs, copies, draws, photographs, prepares, publishes, sells, lends, gives away, distributes, shows or exhibits or has in his possession with intent to publish, sell, lend, give away, distribute, show or exhibit, any article or instrument of indecent or immoral use, or any obscene or indecent book, paper, writing, printed matter, picture, drawing, photograph or engraving; or

"(2) Gives or publishes or causes to be given or published to any person, any written or printed notice or advertisement of or concerning any such article or instrument, or obscene or indecent article or thing; or

"(3) Hires, uses, employs, or permits any person to sell, give away or distribute any such article or instrument, or obscene or indecent article or thing; or

"(4) Prints, publishes, advertises, sells, lends, gives away or shows or has in his possession with intent to publish, advertise, sell, lend, give away or show, any book, paper or other publication that purports to relate or narrate the criminal exploits of any desperate or convicted felon, or any book, paper or other publication that contains accounts or stories of crime or lust or deeds of bloodshed; or

"(5) Presents or exhibits in any public place, by way of show or drama or play, what purports to be the criminal exploits of any desperado or convicted felon, shall be punished upon conviction by imprisonment in the county jail not more than six months or by a fine of not more than $500 or both."

The trial judge supported his disposition of the case with an oral opinion delivered from the bench.

His statement, which is preserved as a part of the record, condemns ORS 167.150 as invalid for three reasons: (1) it imposes prior restraints upon publication contrary to the Oregon Constitution, Article I, Section 8; (2) it prohibits publication of crime news and deeds of lust and bloodshed thereby invading freedom of speech; (3) the word "obscene," as used by the act, is unconstitutionally vague, measured by the requirements of the Oregon Constitution. Finally, the trial judge was of the opinion that the indictment, because drawn in the language of the statute, must fall for indefiniteness. "The very language of the statute forces the grand jury to draw the indictment in a language which is nothing but a conclusion of law."

The trial judge gave consideration to the act as a whole, stating that he could save a part only by "taking an editorial shears and paste pot and re-writing the statute." We think, however, that the first subsection, ORS 167.150 (1) sets out a crime which is complete in itself and severable from the remaining activities proscribed by the act. Our legislature has declared by statute, ORS 174.040, that if any part of an act is held unconstitutional the remaining part shall continue in force unless "so essentially and inseparably connected with and dependent upon the unconstitutional part that it is apparent that the remaining parts would not have been enacted without the unconstitutional part" or unless the remaining parts, standing alone, "are incomplete and incapable of being executed in accordance with the legislative intent." ORS 174.040, which became law in 1951, Or L 1951, ch 314, § 4, was in effect when the Oregon Revised Statutes were enacted pursuant to Or L 1953, ch 3. Since the code is an independent enactment, and not merely a compilation of prior law, *State v. Davis,* 207 Or 525, 296

P2d 240 (1956), *State v. Holland,* 202 Or 656, 277 P2d 386 (1954), we are under a duty to defer to the legislative rule of construction. Moreover, ORS 174.040 does no more than to codify what has long been the common law rule of construction in this state. *Dodd v. State Industrial Accident Commission,* 211 Or 99, 112, 310 P2d 324, 311 P2d 458, 315 P2d 138 (1957).

■ It is apparent that ORS 167.150 goes far toward exhausting the limits of constitutional power in dealing with obscene and other undesirable material, if in fact it does not go beyond such limits. While the act does not make criminal the mere possession of material declared to be unlawful, it does punish every act of creation, distribution or attempted distribution of such material. Moreover, the act sets up five categories of offenses, violation of any one of which would subject the offender to fine and imprisonment. Under these circumstances we believe that the act as a whole must be preserved even though some particular section should fall. Since, therefore, the validity of ORS 167.150 (1) is not dependent upon the validity of the remaining four subsections of the statute, it is unnecessary to determine on this appeal whether or not the remaining subsections abridge any constitutionally guaranteed freedoms.

In support of the result reached below, the defendant points out that the statute, in terms, requires no element of scienter on the part of one who distributes obscene material. From this he claims that it was the intent of the authors to impose liability without mens rea. The briefs on this appeal were filed before the decision of the United States Supreme Court in *Smith v. California,* 361 US 147, 80 S Ct 215, 4 L Ed 2d 205 (1959), and, as respondent notes, that case is controlling here. Smith, a bookseller, was convicted in

California for the violation of an act which made it unlawful for any person:

> "* * * to have in his possession any obscene or indecent writing, (or) book * * * in any place of business where * * * books * * * are sold or kept for sale."

As construed by the courts of California, this statute imposed absolute criminal liability without the necessity of proving knowledge on the part of the bookseller of the obscene character of the book. The Supreme Court reversed the conviction, a majority holding that the statute, as so construed and applied, would place a serious restriction upon distribution of books not obscene. The outer limits of the rule adopted were not explored. In this regard the court said:

> "We need not and most definitely do not pass today on what sort of mental element is requisite to a constitutionally permissible prosecution of a bookseller for carrying an obscene book in stock; whether honest mistake as to whether its contents in fact constituted obscenity need be an excuse; whether there might be circumstances under which the State constitutionally might require that a bookseller investigate further, or might put on him the burden of explaining why he did not, and what such circumstances might be. * * *"

From this it is apparent that ORS 167.150 is invalid unless knowledge is a necessary element of the offense. Generally, if an act is made criminal by statute but is not among those offenses deemed infamous at common law, omission of a requirement of knowledge from the statutory definition makes the act punishable without mens rea. *State v. Brown,* 73 Or 325, 144 P 444 (1914), *State v. Wojahn,* 204 Or 84, 282 P2d 675 (1955). We have held, however, that the appearance or non-appearance of the word "knowingly" in

the definition of a statutory offense is not conclusive, and that the requirement of scienter is "a matter of construction, to be determined by considering the subject-matter of the statute, the language of the act, the evil sought to be eradicated or prevented, and the consequences of the several constructions to which the statute may be susceptible." *State v. Laundy,* 103 Or 443, 204 P 958, rehearing denied 103 Or 443, 206 P 290 (1922). Since we have a duty to give an act a constitutional construction if it can be done without wrenching the meaning of words, *Wright v. Blue Mountain Hospital District,* 214 Or 141, 328 P2d 314 (1958), we hold that ORS 167.150 (1) can be enforced against only those who "knowingly" violate its provisions. But we do not decide here what the substance of that knowledge must be. The language of *Smith v. California* hints that the federal constitution may impose a more restrictive standard of scienter than is necessary to convict of offenses where free speech is not involved.

■ A more troublesome question is posed by the trial judge's finding that ORS 167.150 (1) imposes a prior restraint upon publication. Article I, Section 8, of the Oregon Constitution reads as follows:

"No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

It will be noted that ORS 167.150 (1) imposes penalties not only upon the actual distribution of obscene material but also upon the act of creating it and upon possession "with intent to sell." One may argue that by thus condemning the possession of such

material before it reaches the public an effective "prior restraint" is imposed contrary to the constitutional mandate. In such a view no penalty for abuse of speech may be imposed prior to a sale or other distribution by the defendant of the offending book. The constitutional guarantee extends, of course, not only to the original publisher but also to every intermediate distributor until the book comes finally into the hands of the public at large. *Lovell v. City of Griffin,* 303 US 444, 58 S Ct 666, 82 L Ed 949 (1938).

In the narrowest view "prior restraint" embraces only administrative censorship. This is historically sound and four dissenting justices in the leading case to consider the subject, *Near v. Minnesota,* 283 US 697, 51 S Ct 625, 75 L Ed 1357 (1931), thought it should be so limited. On the other hand, taking the broadest possible view, prior restraint may be thought to signify any penalty inflicted before an actual dissemination of the challenged reading matter. That was the position taken by the trial judge in this case.

The legal boundaries of prior restraint lie between these extremes. The authors of the state and federal constitutions had before them the experience of the English Licensing Acts and a long history of repression of the press. Early English law attached no sanctity to free speech. The press had long been "regarded rather as an instrument of mischief, which required the restraining hand of government, than as a power for good, to be fostered and encouraged. Like a vicious beast it might be made useful if properly harnessed and restrained." 2 Cooley, Constitutional Limitations (8th ed) p 880. See Patterson, Free Speech and a Free Press, p 37 et seq., Emerson, The Doctrine of Prior Restraint, 20 Law and Contemporary Prob-

lems 649 (1955). The Licensing Acts, however, were unpopular and after the demise of the last in 1694 freedom at least from administrative censorship began in England and later in the Colonies to assume the status of a "common law or natural right." This sentiment was crystallized in a famous paragraph by Blackstone, whose "Commentaries," first published between 1765 and 1769, were known to the founding fathers.

"In this, and other instances which we have lately considered, where blasphemous, immoral, treasonable, schismatical, seditious, or scandalous libels are punished by the English law, some with a greater, others with a less degree of severity; the *liberty of the press,* properly understood, is by no means infringed or violated. The liberty of the press is indeed essential to the nature of a free state: but this consists in laying no previous restraints upon publications, and not in freedom from censure for criminal matter when published. Every freeman has an undoubted right to lay what sentiments he pleases before the public: to forbid this, is to destroy the freedom of the press: but if he publishes what is improper, mischievous, or illegal, he must take the consequences of his own temerity. To subject the press to the restrictive power of a licenser, as was formerly done, both before and since the revolution, is to subject all freedom of sentiment to the prejudices of one man, and make him the arbitrary and infallible judge of all controverted points in learning, religion, and government. But to punish (as the law does at present) any dangerous or offensive writings, which, when published, shall on a fair and impartial trial be adjudged of a pernicious tendency, is necessary for the preservation of peace and good order, of government and religion, the only solid foundations of civil liberty. * * *" 4 Blackstone, Commentaries, ch 11, p 142, 151.

Blackstone's analysis has been criticized not only as "inconsistent with eighteenth-century history" but as embodying an unreal and unworkable criterion. It is pointed out that Blackstone's rule would "forbid the removal of an indecent poster from a billboard" but on the other hand would countenance a "death penalty for writing about socialism." Convincing historical evidence indicates that the free speech provisions of the federal and state constitutions were intended to guarantee more than freedom from prior restraints. Chafee, Free Speech in the United States (1941) pp 9-22. Story expressed the view that freedom from prior restraint exhausted the guarantees of the state constitutions, but reserved judgment whether the federal constitution did not go beyond this. 2 Story, Commentaries on the Constitution of the United States (5th ed, 1891), §§ 1880-1889, 1891-1895, p 634 et seq. The United States Supreme Court decided in favor of the broader protection in a line of cases beginning with *Schenck v. United States,* 249 US 47, 63 L Ed 470, 39 S Ct 247 (1919). It had earlier stated that the "main purpose" of the First Amendment was to prohibit prior restraints. *Patterson v. Colorado,* 205 US 454, 27 S Ct 556, 51 L Ed 879 (1907).

Article I, Section 8, of the Oregon Constitution appears to adopt the formula of the Commentaries. A large majority of states now have constitutional provisions resembling that of Oregon in their wording. Legislative Drafting Research Fund of Columbia University, Index Digest of State Constitutions (2d ed) p 484; 2 Cooley, Constitutional Limitations (8th ed) 876 N.L.; Stimson, The Law of the Federal and State Constitutions of the United States (1908) 144. While the Bill of Rights of the Oregon Constitution is drawn immediately from that of Indiana, see Carey,

ed., The Oregon Constitution (1926) p 28, the prototype of all state freedom of speech provisions on the Oregon model appears to be that of the Pennsylvania Constitution of 1790 which provides (Article IX, Section 7):

> "That the printing-presses shall be free to every person who undertakes to examine the proceedings of the legislature, or any branch of government, and no law shall ever be made to restrain the right thereof. The free communications of thoughts and opinions is one of the invaluable rights of man; and every citizen may freely speak, write, and print on any subject, being responsible for the abuse of that liberty. * * *"

Earlier state constitutions, dating from the Revolutionary period, contained more general guarantees of free speech comparable to that of the First Amendment of the federal constitution. See Perry, ed., Sources of Our Liberties (1952) 301 et seq. The wording of the Pennsylvania model was quickly adopted by the Kentucky and Delaware constitutions of 1792, and since has found wide acceptance. Early state constitutions are collected in Thorpe, The Federal and State Constitutions, Colonial Charters and Other Organic Laws (59th Cong., 2d sess., HR Doc 357).

■ Whether obscenity is a kind of speech protected from "prior restraint" is a matter largely for the discretion of the states, for, given a proper definition of what is obscene, obscenity has been rejected by the United States Supreme Court as "utterly without redeeming social importance" and not within the protection of the Fourteenth Amendment. *Roth v. United States,* 354 US 476, 77 S Ct 1304, 1 L Ed 2d 1498 (1957). Thus, obscenity has been denied protection under federal law against judicially imposed prior

restraints. *Kingsley Books v. Brown,* 354 US 436, 77 S Ct 1325, 1 L Ed 2d 1469 (1957). It had been suggested in *Near v. Minnesota,* supra, 283 US 697, 51 S Ct 625, 75 L Ed 1357 (1931), that "primary requirements of decency" might justify the suppression of obscene publications, but not until the Kingsley case was the Supreme Court called upon to accept or reject the earlier dictum. The Kingsley decision upheld procedure under New York law by which sale of allegedly obscene publications could be enjoined. The New York statute provided for an equity hearing and final judgment within three days after joinder of issue, at which time, if judgment went against the publication, further sale might be prohibited and books in stock destroyed. This procedure was held not to violate due process.

Restraint by injunction has traditionally been thought to inhibit freedom of speech more seriously than restraint by penalties imposed after publication. Differences between the two modes of enforcement exist and in certain situations there may well be a difference in effectiveness between them. Freund, The Supreme Court and Civil Liberties, 4 V and L R 533, 537. As Professor Freund stated: "The generalization that prior restraint is particularly obnoxious in civil liberties cases must yield to more particularistic analysis." Op cit., p 539. Where obscenity is the object sought to be prohibited, it is unlikely that injunctive relief will more effectively accomplish suppression than a criminal statute selectively enforced against those known to be persistent offenders.

■ Assuming for the sake of argument that obscenity is protected from prior restraint by our state constitution, it nevertheless does not appear to us that ORS 167.150 (1) contains any sanction of a kind which

has traditionally been considered such a restraint. We must of course be careful not to limit the sweeping protection that our constitution has accorded to the unfettered distribution of ideas. In so far as parts of ORS 167.150 (1) permit punishment of those creating or merely possessing obscene materials, we recognize that the act could be applied in such a way as to limit distribution severely. But any criminal act may have that effect. The gravamen of prior restraint is not the mere fact that punishment is imposed prior to distribution of allegedly offensive materials. It lies in the attempt to control distribution by means of what may be called the general injunction, whereby criminal penalties are assessed for breach of the injunction rather than for the criminality of the subject matter. Of course, the fact of violation upon which conviction must rest might well—under a constitution which protects free speech—demand the same proofs in either case. *State ex rel Liversey v. Judge of Civil District Court,* 34 La Ann 741 (1882). The injunctive power which Blackstone and other early authorities feared was that exercised by the administrative censor. The doctrine has been extended to acts of judicial officers, *Near v. Minnesota,* supra, 283 US 697, 51 S Ct 625, 75 L Ed 1357 (1931), and in a sense it applies also to penal acts of the legislature, which impose conditions that must be met before speech may be exercised and punish the failure to comply with such conditions. Examples are a non-discriminatory registration requirement imposed on labor organizers, *Thomas v. Collins,* 323 US 516, 65 S Ct 315, 89 L Ed 430, (1945), a license tax upon newspapers, *Grosjean v. American Press Co.,* 297 US 233, 56 S Ct 444, 80 L Ed 660 (1936), or a requirement that handbills contain names and addresses of the authors and dis-

tributors, *Talley v. California,* 362 US 60, 80 S Ct 536, 4 L Ed 2d 559 (1960).

Although the mere authorship of obscenity was not an offense at common law, most state statutes today punish some acts of creation, "especially acts which, like printing, imply a prospective dissemination." Even in the minority of states which restricts penalties to actual distribution, possession with intent to sell is generally indictable. American Law Institute, Model Penal Code, (Tentative Draft No. 6) p 18. So far as we have been able to determine, such acts have never been challenged on the ground that these penalties amount to prior restraints. Among the many cases which impliedly recognize that such prohibitions are not prior restraints are the following: *Barton v. City of Bessemer,* 234 Ala 20, 173 So 626 (1937); *People v. Smith,* 161 Cal App 2d Supp 860, 327 P2d 636 (1958); *People v. Alberts,* 138 Cal App 2d Supp 909, 292 P2d 90 (1957); *State v. McKee,* 73 Conn 18, 46 A 409 (1900); *In re Banks,* 56 Kan 242, 42 P 693 (1895); *Commonwealth v. Isenstadt,* 318 Mass 543, 62 NE2d 840 (1945); *State v. Kohler,* 40 NJ Super 600, 123 A2d 881 (1956); *Commonwealth v. Donaducy,* 167 Pa Super 611, 76 A2d 440 (1950); *State v. Fox,* 71 Wash 185, 127 P 1111 (1912).

So far as "prior restraint" is concerned, the significant thing about this statute is that it imposes no continuing restriction upon the dissemination of the obscene matter—even after the defendant has been found guilty of a violation. Every repeated offense involving the same book requires an independent jury trial in which the fundamental issue of obscenity must be relitigated de novo.

Our finding that the statute in question imposes no prior restraint makes it unnecessary to determine

whether obscene material enjoys a protection from such restraint under the Oregon Constitution, Article I, Section 8, that is not extended to it by the due process guarantees of the Fourteenth Amendment of the federal constitution. We may observe that the problem can by no means be considered settled. It has been held that obscene speech enjoys no protection under a state constitution. *Brown v. Kingsley Books,* 1 NY2d 177, 134 NE2d 461 (1956). On the other hand, one state, West Virginia, has thought it necessary to make a specific exemption of obscenity from the constitutional provision prohibiting prior restraints. Constitution of West Virginia, Article III, Section 7. And in the area of defamatory publications, which presents special though related problems, constitutional protection against prior restraint has often been successfully invoked even though the statements are ruinous and the defendant is not financially responsible. *Kidd v. Horry,* 28 F 773 (1886); *State ex rel Liversay v. Judge of Civil District Court,* supra, 34 La Ann 741 (1882); *Lietzman v. Radio Broadcasting Station WCFL,* 282 Ill App 203 (1935); *Ex parte Tucker,* 110 Tex 335, 220 SW 75 (1920); *Marx & Haas Jeans Clothing Co. v. Watson,* 168 Mo 133, 67 SW 391 (1902); *Montgomery Ward & Co. v. United Retail, Wholesale & Department Store Employees of America,* 400 Ill 38, 79 NE2d 46 (1948); *Lindsay & Co. v. Montana Federation of Labor,* 37 Mont 264, 276, 96 P 127 (1908); *Empire Theater Co. v. Cloke,* 53 Mont 183, 163 P 107 (1917); *Montgomery Ward & Co. v. South Dakota Retail Merchants' & Hardware Dealers' Ass'n* (CC, SD 1907) 150 F 413.

The final ground upon which the trial judge sustained the demurrer to the indictment is that of vagueness, in that the statute "contains no suggestion as to

what might be included within the broad range of the word 'obscene.'" To withstand constitutional attack he thought that the statute should employ "words of ordinary common meaning and understanding. * * * In other words, the words should mean the same to everyone who reads them."

■ Neither party to this appeal argues that obscenity falls within the free speech guarantees of the federal or state constitutions. We think that the authorities marshalled by the majority opinion in *Roth v. United States,* supra, 354 US 476, 1 L Ed 2d 1498, 77 S Ct 1304 (1957) convincingly demonstrate that obscene speech enjoys no such immunity as a matter of history, and we reject an interpretation of our constitution which would protect it in Oregon. The defendant argues here, following the view of the trial judge, that the words of the act "obscene and indecent," standing alone and without statutory definition, are "too broad and indefinite at the present time" to satisfy constitutional requirements.

■ In the same connection the defendant raises a point of pleading which may be answered here. He contends that the indictment formulates its own definition of obscenity as that which tends "to incite lascivious thoughts and to arouse lustful desires," and argues that upon this appeal from a demurrer, the statute must be read as construed by the indictment. Hence, he claims that if the definition of obscenity set forth in the indictment does not provide a constitutional test of what is obscene, the demurrer must be permitted to stand. This, of course, is not the law. ORS 132.520 demands that there be set forth "a statement of the acts constituting the offense in ordinary and concise language, without repetition, and in such manner as to enable a person of common understand-

ing to know what is intended." See also ORS 132.530. It would have been enough in this case to have alleged that the book was obscene or indecent, without more. The use of additional "clarifying" language, setting forth legal conclusions of the prosecutor, was mere surplusage, and may be disregarded since it plainly did not mislead the defendant. *State v. Du Bois,* 175 Or 341, 153 P2d 521 (1944); *State v. Dormitzer,* 123 Or 165, 261 P 426 (1927); *State v. Humphreys,* 43 Or 44, 70 P 824 (1902).

■ While ORS 167.150 (1) makes use of the various descriptive terms "obscene," "indecent" and "immoral," we think that they express but a single attitude which may fairly be described by the one word "obscene." *Commonwealth v. Gordon,* 66 D & C 101, 112 (1949) and cases cited. The impossibility of finding any popularly accepted definition for the word "obscene" must be recognized at the outset. *Lockhart & McClure,* "Literature, The Law of Obscenity, and the Constitution," 38 Minn L R 295, 320 (1954); Symposium, "Obscenity and the Arts," 20 Law and Contemporary Problems 531 (1955). In this, obscenity is like "negligence," "reasonableness" or other terms that embody concepts from which important legal consequences flow. The legal meaning is artificial. If it is thought significant in constitutional terms to circumscribe the definition of obscenity more narrowly than that of other words, it is because speech at the present time occupies a preferred place among bill-of-rights freedoms.

■ Obscenity generally bears a connotation of sexual misconduct in the form of speech. *Commonwealth v. Gordon,* supra, 66 D & C 101, 112 (1949) and cases cited; American Law Institute, Model Penal Code

(Tentative Draft No. 6) p 19 (1957); Lockhart and McClure, "Literature, The Law of Obscenity, and the Constitution," 38 Minn L R 295, 320 (1954). Although the growth of the English common law of obscenity was haphazard, the early cases dealt with conduct related in some way to sex. *Sedley's Case,* 1 Sid 168, 1 Keble 620 (KB 1663); *Regina v. Read,* 11 Mod 205 (QB 1708); *Rex v. Curl,* 2 Str 789 (KB 1727); *Rex v. Wilkes,* 4 Burr 2527 (KB 1770); Alpert, Judicial Censorship of Obscene Literature, 52 Harv L R 40 (1938). As a matter of federal constitutional law it is now clear that obscenity is restricted to sexual matters. *Roth v. United States,* supra, 354 US 476, 1 L Ed 2d 1498, 77 S Ct 1304 (1957). Even in this area the states do not have a free choice to determine for themselves what is obscene. Thus, for example, what has been termed "critical obscenity," the mere general advocacy, in a non-prurient manner, of ideas offensive to current standards of morality, has recently been held to be constitutionally protected speech and no longer within a lawful definition of obscenity. *Kingsley International Pictures Corporation v. Regents of the University of the State of New York,* 360 US 684, 79 S Ct 1362, 3 L Ed 2d 1512 (1959); *Mounce v. United States,* 355 US 180, 78 S Ct 267, 2 L Ed 2d 187 (1957), reversing 247 F2d 148 (9th cir, 1957).

In the past, obscenity has most often been defined by the courts in terms of its "tendency" to arouse sexual thoughts or to corrupt the morals of its readers. American Law Institute, Model Penal Code (Tentative Draft No. 6) p 19; Lockhart and McClure, Obscenity in the Courts, 20 Law and Contemporary Problems 587, 590. The test most widely used in this country in a former day was that which Lord Cock-

burn announced in *Regina v. Hicklin,* LR 2 QB 360 (1868):

> "* * * I think the test of obscenity is this: whether the tendency of the matter charged as obscenity is to deprave and corrupt those whose minds are open to such immoral influences, and into whose hands a publication of this sort may fall."

The test was a failure since a book might be condemned for the chance effect of isolated passages upon the most susceptible, and thus applied would, in the words of Judge Learned Hand, "reduce our treatment of sex to the standard of a child's library in the supposed interest of a salacious few." *United States v. Kennerley,* 209 F 119 (DCSDNY 1913). Despite a strong undercurrent of judicial dissatisfaction, the Hicklin rule did not come to be generally rejected until the years following the decision in *United States v. One Book Entitled Ulysses,* 72 F2d 705 (2d cir 1934). In that case the court adopted a somewhat vague test based on the "dominant effect" of the book considered as a whole. The opinion had many loose ends and gave no satisfactory definition of obscenity. See *United States v. Levine,* 83 F2d 156 (2d cir 1936); Alpert, Judicial Censorship of Obscene Literature, 52 Harv L R 40, 69; Lockhart and McClure, Literature, the Law of Obscenity, and the Constitution, 38 Minn L R 295, 326. The Hicklin rule may fairly be said to have been laid to rest by the decision of the United States Supreme Court in *Butler v. Michigan,* 352 US 380, 77 S Ct 524, 1 L Ed 2d 412 (1957). A Michigan statute under which Butler was convicted made it a misdemeanor to sell any book "containing obscene, immoral, lewd or lascivious language * * * tending to incite minors to violent or depraved or immoral acts, manifestly tending to the corruption of the morals

of youth." The court held that the statute violated due process, in that: "The incidence of this enactment is to reduce the adult population of Michigan to reading only what is fit for children." If any doubt remained about the Hicklin rule, it was laid to rest a few months later when *Roth v. United States,* supra, 354 US 476, 77 S Ct 1304, 1 L Ed 2d 1498 (1957), expressly held it to be unconstitutional.

Although the Hicklin rule has fallen by the way, it remained common, at least before the decision in *Roth v. United States,* supra, to define obscenity in terms of "tendency" or "effect." If the book, taken as a whole, had a tendency to corrupt the average reader it was obscene. A typical definition is that given by the court in *People v. Isenstadt,* 318 Mass 543, 62 NE2d 840 (1945):

> "A book is 'obscene, indecent or impure' within the statutory prohibition if it has a substantial tendency to deprave or corrupt its readers by inciting lascivious thoughts or arousing lustful desire."

See also, *People v. Wepplo,* 78 Cal App 2d Supp 1959, 178 P2d 853 (Super Ct, 1947); *Commonwealth v. New,* 142 Pa Super 358 (1940); *People v. Wendling,* 258 NY 451, 180 NE 169, 81 ALR 799 (1932).

Another test couched in terms of effect would import a "clear and present danger" rule into the law of obscenity and limit conviction to a case where the writing alleged to be obscene is shown to lead, in some perceptible way, to visibly manifested criminal conduct. This was the test used by Judge Curtis Bok in *Commonwealth v. Gordon,* 66 D & C 101 (1949) affirmed sub nom *Commonwealth v. Feigenbaum,* 166 Pa Super 120, 70 A2d 389 (1950). Judge Bok's defi-

nition has not won acceptance, even in Pennsylvania, where the Supreme Court of that state, in refusing to hear an appeal from the Gordon case, expressly disclaimed reliance upon the lower court's opinion. Reporter's Note, 166 Pa Super 120. American Law Institute, Model Penal Code (Tentative Draft No. 6) p 22; Note, 28 N Y U L R 876, 887 (1953). It has, however, attracted some favorable judicial comment. *Bantam Books v. Melko,* 25 NJ Super 292, 315, 96 A2d 47 (1953); *United States v. Roth,* 237 F2d 796, 806, 826 (Concurring opinion of Judge Frank).

Serious difficulties inhere in a definition of obscenity which is expressed in terms of effect upon the reader. First, the definition—if, for instance, similar to that quoted above from *People v. Isenstadt*—is too general in that many works of recognized literary merit may conceivably "incite lascivious thoughts or arouse lustful desire" and thus presumably "deprave and corrupt" the reader. Certainly this is true if "lascivious" and "lustful" are merely synonyms for "sexual." Second, it has not been demonstrated to the satisfaction of all that obscene literature has a depraving or corrupting influence, or that it leads to overt criminal acts. Thus, two dissenting justices in *Roth v. United States,* supra, 354 US 476, 77 S Ct 1304, 1 L Ed 2d 1498 (1957) thought the connection was not proven and that this was a fatal defect. Apparently adopting Judge Bok's "clear and present danger" test, Justice Douglas wrote:

> "The absence of dependable information on the effect of obscene literature on human conduct should make us wary. It should put us on the side of protecting society's interest in literature, except and unless it can be said that the particular publication has an impact on action that the government can control."

It has been noted that "on both sides there is much heat and little light on this critical question." Lockhart & McClure, "Literature, The Law of Obscenity, and the Constitution," 38 Minn L R 295, 383. As Justice Harlan observed in his separate opinion in the Roth case, the division of opinion on the subject cautions one to respect the legislative choice.

Shortly after oral argument in the Roth case, the American Law Institute published Tentative Draft No. 6 of its Model Penal Code, dealing with the law of obscenity. Recognizing the shortcomings of a definition based on "tendency" or "effect," the Institute repudiated the usual test and substituted a test based upon "appeal." It defined obscenity as follows:

"A thing is obscene if, considered as a whole, its predominant appeal is to prurient interest, i.e., a shameful or morbid interest in nudity, sex, or excretion, and if it goes substantially beyond customary limits of candor in description or representation of such matters. * * *"

The Institute appended this explanation of its position:

"We reject the prevailing test of tendency to arouse lustful thoughts or desires because it is unrealistically broad for a society that plainly tolerates a great deal of erotic interest in literature, advertising, and art, and because regulation of thought or desire, unconnected with overt misbehaviour, raises the most acute constitutional as well as practical difficulties. We likewise reject the common definition of obscene as that which 'tends to corrupt or debase.' If this means anything different from tendency to arouse lustful thought and desire, it suggests that change of character or actual misbehaviour follows from contact with obscenity. Evidence of such consequences is lacking; if actual proof of tendency to corrupt

were required, prosecutors would have a difficult task. On the other hand, 'appeal to prurient interest' refers to qualities of the material itself: the capacity to attract individuals eager for a forbidden look behind the curtain of privacy which our customs draw about sexual matters." (p 10).

Following publication of the Model Penal Code, the United States Supreme Court announced its decision in *Roth v. United States,* supra, 354 US 476, 77 S Ct 1304, 1 L Ed 2d 1498 (1957), and apparently adopted the Model Code definition as the broadest which might be applied by a state consistently with the Constitution. The opinion of the majority, written by Mr. Justice Brennan, defined the "proper standard" to be:

"* * * whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest."

In a footnote, the court stated that it perceived "no significant difference between the meaning of obscenity developed in the case law and the definition of the ALI Model Penal Code."

The Roth case combined two appeals, that of Roth who was convicted for violation of a federal obscenity statute, and that of Alberts, who was convicted for violation of a California statute. In the federal prosecution the trial judge had defined obscenity as "that form of immorality which has relation to sexual impurity and has a tendency to incite lustful thoughts." In the California prosecution the trial judge applied the test used in *People v. Wepplo,* supra, 78 Cal App 2d Supp 959, 178 P2d 853 (Super Ct 1947), whether the material has "a substantial tendency to deprave or corrupt its readers by inciting lascivious thoughts

or arousing lustful desires." The majority affirmed both convictions, stating that the trial courts "sufficiently followed the proper standard."

A separate opinion by Justice Harlan criticized the majority for assimilating different tests of obscenity into "one indiscriminate potpourri." If the Model Penal Code definition was in fact exclusive, then, Justice Harlan noted, the court had failed to follow its own rule, and rather than an affirmance, the convictions "should surely be reversed."

It is difficult not to agree with the criticism. A test based upon "appeal" is certainly not conterminous with a test based upon "effect." Yet there is a rough overlapping, and if this were the only difference between the Model Code and common law definitions, one questions whether the due process clause of the Fourteenth Amendment ought to be invoked to defeat the choice made by the State. A more significant difference between the traditional definition and that of the Model Code lies in the great emphasis with which the Code insists that to be obscene a book must be shocking. Under the usual test, it is enough that the material has a tendency to "deprave or corrupt its readers by inciting lascivious thoughts or arousing lustful desire." *People v. Isenstadt,* supra, 318 Mass 543, 62 NE2d 840 (1945). The words "deprave or corrupt" suggest, perhaps, sexual perversion or abnormality, but they need not be so interpreted. It has been pointed out that the cases offer no clear pattern and that "thoughts of sex in any form" have been included within the definition of what is obscene. Lockhart and McClure, "Literature, The Law of Obscenity, and the Constitution," 38 Minn L R 295, 330. Moreover, only by indirection, if at all, do the words sug-

gest that the manner of presentation of the material must itself be "depraved or corrupt."

On the other hand, the Model Penal Code, by requiring that the material, to be obscene, must appeal to "prurient interest" and go "substantially beyond customary limits of candor in description or representation" emphasizes strongly that the manner of presentation must itself amount to shameful and disgusting conduct outside the pale of what is tolerable to the community at large. The majority opinion in the Roth case defines "prurient" as "having a tendency to excite lustful thoughts." (354 US 476 at 486 n. 20). We think, however, that the court had in mind the narrower meaning used by the Model Penal Code or means to use the narrower meaning in cases following Roth. See *Times Film Corporation v. City of Chicago*, 355 US 35, 2 L Ed 2d 72, 78 S Ct 115, reversing 244 F2d 432 (7 cir 1957).

■ We accept the American Law Institute's definition of obscenity as a proper standard for Oregon courts to follow. In our opinion it is not necessary to prove that allegedly obscene matter has an effect upon the reader if its appeal is to prurient interest. While arguments favoring the suppression of obscenity are, as we have noted, commonly based on reasoning that such material corrupts its readers, probably an equally common but largely unexpressed rationale is that pandering to prurient taste is itself thought to be a marginal kind of sexual crime. Like many forms of sexual aberration, it may fall short of an overt nuisance, but such is the abhorrence which society feels for the offense that legal sanctions are applied as a matter of course.

The authors of the Model Penal Code recognize, moreover, that obscenity must be defined by the com-

munity standards of the generation which applies the test. No other rule would be tolerable in an age which endorses great sexual frankness in every means of expression.

■ Although material alleged to be obscene must generally be judged on the basis of its appeal to the average member of the community, we think it may be judged by its appeal to a special audience—for example, children—if it clearly is aimed at such an audience. American Law Institute, Model Penal Code (Tentative Draft No. 6) p 1. In such a case, the federal constitution would probably require a strong showing that the material is in fact directed solely or chiefly at a special group. *Butler v. Michigan,* supra, 352 US 380, 77 S Ct 524, 1 L Ed 2d 412 (1957).

In fairness, it should be noted that the trial judge also thought the American Law Institute test of obscenity was a proper one, but felt that the statute would not admit of such interpretation. However, this court has never hesitated to give criminal acts a limiting construction when to do otherwise would require a finding of unconstitutionality. *State v. Hoover,* 219 Or 288, 347 P2d 69 (1959) and cases therein cited. The proper test is, as we have stated, "whether we can properly limit the meaning of general words to cases reasonably within them and within the evil which the legislature intended to suppress." *State v. Anthony,* 179 Or 282, 169 P2d 587 (1946).

Since this is an appeal from a demurrer, it would be premature to discuss here the interesting problems in the law of evidence that arise in the trial of obscenity cases, or to concern ourselves with the equally important problem of the respective functions which judge and jury perform in determining whether a work is obscene. We note on the latter point that the

United States Supreme Court has apparently decided to exercise only a limited review of jury verdicts, if the case is submitted under proper instructions. *Roth v. United States,* supra.

In an early federal prosecution for obscenity in New York City, Judge Learned Hand, then sitting as district judge, felt himself bound to apply the prevailing Hicklin rule, but in a brief and eloquent opinion he appealed for the adoption of a more liberal standard. *United States v. Kennerley,* 209 F 119 (DC SDNY 1913). The path which he suggested has, we think, become the law of obscenity today. The Kennerley decision need not be quoted here, but deserves to be engrafted as a gloss upon every statute which provides for the punishment of obscene publications. We note our approval.

The judgment is reversed.

McALLISTER, C. J., PERRY, J., and MILLARD, J., concur in this opinion.

O'CONNELL, J., dissenting.

There can be no doubt that our obscenity statute, ORS 167.150, as interpreted by the majority satisfies the requirements of the First and Fourteenth Amendments of the Constitution of the United States. On that point *Roth v. United States,* 354 US 476, 77 SC 1304, 1 L Ed2d 1498 (1957) is controlling. However, we have the additional responsibility of testing the statute against the requirements of our own Constitution. (Oregon Constitution, Article I, § 8.) In meeting that responsibility the Roth case is of value to us only to the extent that the reasons supporting that court's interpretation of the Federal Constitution may be used by us as a guide in construing our own. I do

not believe that the majority opinion in the Roth case affords such a guide because it evades the very problem which must be met in dealing with the constitutionality of this type of legislation. The court held, "obscenity is not within the area of constitutionally protected speech or press." 354 US at 485. If, as Justice Harlan points out in his concurring and dissenting opinion, we could isolate " 'obscenity' as a peculiar *genus* of 'speech and press', which is as distinct, recognizable and classifiable as poison ivy is among other plants" (354 US at 476), there would be no difficulty in separating obscene matter from constitutionally protected expressions and in sustaining a statute which suppresses "obscenity." But in the process of determining whether a particular writing is obscene, it is necessary to decide whether that writing is entitled to the constitutional protection of freedom of speech or press. This is implicit in the definition of obscenity which the court adopts. According to that definition, a writing is not obscene if the prurient appeal does not predominate; to be constitutionally protected it must not be "utterly without redeeming social importance." (354 US at 484.) Publications are deemed to be worth protecting under our notions of constitutional right, even though they may espouse the most unpopular and antisocial ideas, including ideas about sex.

The significant and difficult question which we must meet, and which the court in the Roth case evaded, is the extent to which the legislature may inhibit free speech and press. The problem here is basically the same as it is where legislation calls for the proscription of utterances relating to other ideas as, for example, those concerning economics, government, or religion. In these other areas the expression

of ideas, good and bad, is protected unless the words used create a clear and present danger that they will bring about an evil which is within the legislative power to prevent. *Thomas v. Collins,* 323 US 516, 65 SC 335, 89 L ED 430 (1945) (soliciting union membership); *Taylor v. Mississippi,* 319 US 583, 63 SC 1200, 87 L Ed 1600 (1943) (advocating refusal to salute the flag by members of Jehovah's Witnesses); *Thornhill v. Alabama,* 310 US 88, 60 SC 736, 84 L Ed 1093 (1940) (picketing); *Herndon v. Lowry,* 301 US 242, 57 SC 732, 81 L Ed 1066 (1937) (communist organizer attempting to incite to insurrection).

It is true that the clear and present danger doctrine has been criticized on various grounds (because it is overly restrictive, Meikeljohn, Free Speech and Its Relation to Self-Government, pp. 1-2 (1948)); or because it tends to be applied in a formulary way, Corwin, Bowing Out Clear and Present Danger, 27 Notre Dame Lawyer 325, 356 (1956); or because it over-emphasizes imminence in the weighing of competing social values, Judge Learned Hand in *United States v. Dennis,* 183 F2d 201 (2nd Cir 1950), but if we are to retain the doctrine, consistency would seem to demand that we apply it across the board to all utterances including those relating to sex.

It is probable that this respect for consistency prompted Judges Bok in *Commonwealth v. Gordon,* 66 Pa D & C 101 (1949), aff'd. sub nom *Commonwealth v. Feigenbaum,* 166 Pa Super 120, 70 A2d 389 (1950), and Frank, in *United States v. Roth,* 237 F2d 796, 801 (2nd Cir 1956) (concurring opinion), aff'd., 354 US 476 (1957) to premise their respective opinions on the doctrine. Perhaps they pressed the test too far in insisting that the publication of ideas about sex cannot be restricted constitutionally unless they incite overt

anti-social acts. Am L Inst., Model Penal Code, § 207.10 (Tent. Draft No. 6, p. 28, 1957).

But even if one does not wish to go this far with the clear and present danger doctrine, or even accept it at all, there still remains the task of weighing the public interest in free speech against the public interest in being free from demoralizing publications. The courts are forced to weigh these competing interests anytime the expression of an idea is contested by the State. Unless the evil sought to be curbed by the legislature is substantial, the right to express one's ideas cannot constitutionally be restrained.

What then, are the evils involved in the publication of matters involving sex which call for such restraint? Our statute gives us no guide, unless we can find it in the definition of obscenity. The definition relied upon in the Roth case, and by the majority in the case at bar, is that taken from the Model Penal Code: "A thing is obscene if, considered as a whole, its predominant appeal is to prurient interest, i.e., a shameful or morbid interest in nudity, sex, or excretion, and if it goes substantially beyond customary limits of candor in description or representation of such matters." § 207.10 (2) (Tent. Draft No. 6, p. 1, 1957).

What is a "shameful" or a "morbid" interest in nudity, sex or excretion? When does that interest assume the character of predominance? Predominance over what other interests? The essay appended to the proposed model penal code on this subject attempts to explain obscenity in various terms, but these terms are equally obscure and afford no basis for making judicial choices. The problem which faces us here is well stated by Professor Kalven in 24 Chi L Rev 769 (1957) in a combined review of St. John-Stevas' book,

"Obscenity and the Law," and Judge Frank's concurring opinion in *United States v. Roth,* supra at p. 801. Professor Kalven states, at pages 771-72:

> "So viewed the law of obscenity immediately becomes curious and disturbing. Although the courts have not customarily been fully explicit about it, the law on obscenity appears aimed at a series of possible evils: the arousing of feelings of disgust and revulsion; the advocacy of improper sexual values; the exciting of the mind to sexual imagery; the incitement to anti-social sexual conduct. And it appears reasonably clear too that any of these standing alone has been sufficient to support a conviction.   *   *   *
>
> "Let us return for a moment now to the possible evils. Surely, the arousing of disgust or revulsion in an adult who is perfectly free to leave the material alone is a curious predicate for a crime. And surely too the advocacy of ideas about sexual conduct would seem entitled to the same protection as the advocacy of ideas about other issues in the public domain. We are left then with the evil of imagery so intense as to move one to improper sexual action or with the arousing of inner sexual excitement, short of action. The law has never required that overt action be the effect of obscenity and the evidence that it does have this effect on the adult is totally missing. We come then to the apparent chief target of the law of obscenity today: the arousing of sexual thoughts or desire in adults short of action."

He goes on at page 773 to say that:

> "*   *   *   [I]t is hard to see how language dealing with love, lust, and sex is any less entitled to First Amendment scrutiny when regulation is attempted than is the language of violence and revolution. And if obscenity is to be tested against customary clear and present danger notions, it is difficult to see that any specified evil as to adults

can be said to be sufficiently clear or present, or, and this should be underscored, sufficiently substantial to resolve these difficulties by requiring that there be the threat of clear and present danger not of sexual fantasy merely but of criminal sexual conduct. This is perhaps a statesman-like way to leave the law intact, but in fact it is tantamount to repealing it."

As indicated above, neither *Roth v. United States,* supra, nor the majority opinion in the case at bar faces up to the problem presented by the impact of obscenity legislation on the constitutional right of free speech. This is also the deficiency of the model penal code. It is framed and explained as though freedom of speech was irrelevant or, at least, very incidental. The breadth and vagueness which characterizes the definition of obscenity and the scope of the statute proposed as a model might be excused if the statutory proscription had no effect upon constitutional rights. As expressed in *Winters v. New York,* 333 US 507, 517, 68 SC 665, 92 L Ed 840 (1948), "This Court goes far to uphold * * * statutes that deal with offenses, difficult to define when they are not entwined with limitations on free expression." But this statute does have such an effect on constitutional rights of free expression and it must, therefore, meet a higher standard of definiteness. The general principle is stated thus in *Winters,* supra at pp. 509-510:

"It is settled that a statute so vague and indefinite, in form and as interpreted, as to permit within the scope of its language the punishment of incidents fairly within the protection of the guarantee of free speech is void, on its face, as contrary to the Fourteenth Amendment * * *. A failure of a statute limiting freedom of expression to give fair notice of what acts will be punished and such a statute's inclusion of prohibitions against expres-

sions, protected by the principles of the First Amendment, violates an accused's rights under procedural due process and freedom of speech or press."

In accord: *Stromberg v. California,* 283 US 359, 369, 51 SC 532, 75 L Ed 1117 (1931); *Herndon v. Lowry,* supra at pp 258-59; *Joseph Burstyn, Inc. v. Wilson,* 343 US 495, 504-05, 72 SC 777, 96 L Ed 1098 (1952).

It is said in Roth that the standard set by the statute is sufficiently definite to "give adequate warning of conduct proscribed and mark '\* \* \* boundaries sufficiently distinct for judges and juries to administer the law \* \* \*'", quoting from *United States v. Petrillo,* 332 US 1, 7-8, 67 SC 1538, 91 L Ed 1877 (1947). But the boundary between that which is permissible to utter (admittedly including the treatment of sexual matters capable of inciting lustful thoughts) and that which is proscribed, is not marked out and, consequently, neither the judge nor the jury have any way of deciding what the bounds may be.

No constitutional objection can be leveled at a statute which permits the jury to apply a standard of conduct in the community as the predicate of a crime where the community's notions of what is right and wrong is determinable within some limits, even though those limits are broad. *Omaechevarria v. Idaho,* 246 US 343, 38 SC 323, 62 L Ed 763 (1918); *United States v. Ragen,* 314 US 513, 62 SC 374, 86 L Ed 383 (1942), rehearing denied, 315 US 826, 62 SC 620, 86 L Ed 1222 (1942); *United States v. Petrillo,* supra. But as Justice Douglas points out in his dissent in Roth, "the standard of what offends the common conscience of the community \* \* \* is too loose, too capricious, too destructive of freedom of

expression to be squared with the First Amendment."
354 US at page 512.

I believe that Professor Kalven captured the truth on this point in the following passage from the book review referred to above:

"* * * I think there is much to the view that obscenity is not only intolerably vague as defined by the law today but that the vagueness cannot be cured. At least not without resorting to the absurd specificity of the Hollywood Movie Code. We can perhaps distinguish between degrees of explicitness in the discussion of sex, but among explicit discussions of sex it is a heroic venture to attempt to distinguish between the good and the bad. In any event, and this is the main point, the distinction is an extraordinarily subjective and subtle one upon which to base criminal guilt. Perhaps the difficulty arises because the law has been unable to define obscenity in terms of its content. It has rather always talked in terms of effects. And the effects in turn are hard to specify, partly because we know so little about them and partly because we seem anxious only to prohibit 'impure' responses. Hence, the law is always close to defining obscenity in terms of itself. Most people who have advocated some regulation of obscenity have had the French postcard or its equivalent in mind. The difficulty, however, is that there seems to be no way to phrase a formula that will reach the postcard and leave Molly Bloom's soliloquy in *Ulysses* or the Song of Songs unscathed." 24 Chi L Rev at 773.

If the standard were predicated upon moral considerations alone, the task of judging a publication would be difficult enough, but we are expected to test the author's effort by aesthetic standards as well. Applying the definition accepted by the majority, a writing will pass the test of the criminal law and be

constitutionally protected even though it has a prurient appeal, if that appeal does not "predominate," whatever that may mean. Since the defendant is brought to court under a criminal charge, the jury must pass upon his guilt judged by this so-called standard. The jury thus applies the Constitution, marking out the limits of free speech. With a standard as vague as "obscenity" our most precious freedom is left to a precarious fate. Apparently the authors of the model penal code saw this danger to the accused's constitutional rights, because their report includes the unique proposal that the court should have the power to dismiss a prosecution for obscenity or acquit a defendant notwithstanding a verdict of guilty. This is a compliment to the judiciary, but I fear that in this area of aesthetics, psychiatry and morality most of us as judges must confess our inability to distinguish that which has a predominantly prurient appeal from that which does not.

As indicated above, we can intelligently make the choice of whether a publication is constitutionally protected only if we are in a position to weigh the evils involved in the dissemination of ideas relating to sex against the evils of restricting free speech. Since I do not know what are the evils (if any), nor their gravity (if such evils exist), presented by "obscene" publications, it is impossible for me to make this judgment upon the basis of the standard proposed in our statute. I believe the making of such a judgment is also impossible for members of a jury and for my brethren of the bench. Under these circumstances our statute must be declared unconstitutional on the ground that its enforcement involves too great a danger to the right of free expression guaranteed by our Constitution. Oregon Constitution, Article I, § 8. The

views expressed by Mr. Justice Douglas in his dissent in *Roth v. United States,* 354 US 508-514, should be adopted by this court. There, he says:

"When we sustain these convictions, we make the legality of a publication turn on the purity of thought which a book or tract instills in the mind of the reader. I do not think we can approve that standard and be faithful to the command of the First Amendment which by its terms is a restraint on Congress and which by the Fourteenth is a restraint on the States.

"* * * * *

"The tests by which these convictions were obtained require only the arousing of sexual thoughts. Yet the arousing of sexual thoughts and desires happens every day in normal life in dozens of ways * * *.

"The test of obscenity the Court endorses today gives the censor free range over a vast domain. To allow the State to step in and punish mere speech or publication that the judge or the jury thinks has an *undesirable* impact on thoughts but that is not shown to be a part of unlawful action is drastically to curtail the First Amendment. As recently stated by two of our outstanding authorities on obscenity, 'The danger of influencing a change in the current moral standards of the community, or of shocking or offending readers, or of stimulating sex thoughts or desires apart from objective conduct, can never justify the losses to society that result from interference with literary freedom.' Lockhart & McClure, Literature, The Law of Obscenity and the Constitution, 38 Minn L Rev 295, 387."

"* * * * *

"Freedom of expression can be suppressed if, and to the extent that, it is so closely brigaded with illegal action as to be an inseparable part of it. Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 498; Labor Board v. Virginia Power Co., 314 U.S. 469, 477-478. As a people, we cannot afford to

relax that standard. For the test that suppresses a cheap tract today can suppress a literary gem tomorrow. All it need do is to incite a lascivious thought or arouse a lustful desire. The list of books that judges or juries can place in that category is endless."

Since we must weigh the public interest in free expression against the public interest in preventing the stimulation of lustful thoughts (or as the model penal code puts it, the evocation of "repression—tensions" created by "the deliberate stimulation and exploitation of emotional tensions arising from the conflict between social convention and the individual's sex drive," § 207.10 (Tent. draft No. 6, p. 30, 1957) it is relevant to assess the respective benefits which accrue to society with and without obscenity legislation. In the first place it must be recognized that even if the courts, in the careful guardianship of free expression, limit the application of obscenity statutes to the hardest core of pornography, the mere presence of the statute and the threat it holds can be used (and has been used) to censor works which could pass the judicial test. Extralegal censorship can come from various sources and the pressures upon the district attorney's office to prosecute is sometimes great. Extralegal Censorship of Literature, 33 N Y U L Rev 989 (1958). When prosecution is imminent or threatened, the book dealer frequently (probably usually) prefers to withdraw the book under attack rather than endure the inconvenience and expense incident to such prosecution.[1] Thus the vagueness of the test for obscenity may become a weapon of censorship in the hands of

[1] Threats of prosecution are often made by prosecuting attorneys at the behest of private censor organizations. Police or prosecuting attorneys give notice to distributors to withdraw publications appearing on blacklists prepared by these private censors. Lockhart & McClure, Literature, The Law of Obscenity and the Constitution, 38 Minn L Rev 295, 311. The most elaborate blacklists are those of the National Organ-

those whose interest in free expression is overriden by an excess of zeal for virtue as they understand it. Inseparability in Application of Statutes Impairing Civil Liberties, 61 Harv L Rev 1208, 1209 (1948); Scope of Statutes Censoring Obscene Literature, 40 Ill L Rev 417 (1946); 33 N Y U L Rev, supra at 1007-08. As a consequence, through this intervention of the censorious with easily offended sensibilities, we are deprived of reading much of which would clearly be acceptable under any reasonable application of the definition adopted by this court.

If we look at the matter from the standpoint of the harm that would be visited upon society by the unrestrained expression of sexual ideas, it is most difficult to find an evil great enough to warrant the sacrifice of constitutional rights in eradicating it.[2] I do not

---

ization for Decent Literature (NODL). Included on the NODL lists are William Faulkner's *Pylon, Sanctuary,* and *Soldier's Pay;* James M. Cain's *Mildred Pierce, The Postman Always Rings Twice;* Erskine Caldwell's *God's Little Acre, A House in the Uplands, Journeyman, Tobacco Road, Trouble in July, A Woman in the House;* W. Somerset Maugham's *Fools and Their Folly, The Painted Veil, Up at the Villa;* Nelson Algren's *The Man With the Golden Arm;* Niven Busch's *Duel in the Sun;* C. S. Forester's *The African Queen;* Ernest Hemingway's *A Farewell to Arms;* James A. Michener's *Tales of the South Pacific;* Irwin Shaw's *The Young Lions;* Boccaccio's *Decameron.* Also included is nonfiction such as *The Sexual Side of Marriage* by M. J. Exner, M.D.; *How Shall I Tell My Child* by Belle S. Mooney, M.D., and *The Story of My Psychoanalysis* by John Knight. Ibid., pp. 317-318.

"As recent as 1905 the Brooklyn Library excluded from children's rooms, *The Adventures of Tom Sawyer* and *The Adventures of Huckleberry Finn,* the latter having been banned from the public library in Concord, Massachusetts as 'trash and only suitable for the slums.' " 60 W Va L Rev 89, 90 (1957).

[2] "Unfortunately, both for those who seek to confine obscenity laws to an identifiable evil and for those who seek to expand controls with the hope of reducing juvenile delinquency, we know little or nothing about the consequences of reading obscene or shocking literature. The verdict of two eminent scholars on this point is as follows:

" 'Although the whole structure of obscenity censorship hinges upon the unproved assumption that "obscene" literature is a significant factor in causing sexual deviation from the community standard, no report can be found of a single effort at genuine research to test this assumption by singling out as factor for study the effect of sex literature upon sex conduct.' [Lockhart & McClure, Literature, The Law of Obscenity and the Constitution, 38 Minn L Rev 295, 385.]

"Indeed, for an undetermined number of individuals, the writing or reading of obscenity may be a substitute for rather than a stimulus to physical sexuality." Moral Penal Code, Tentative Draft No. 6, p. 24.

believe that it is realistic to assume that the enforce-
ment of obscenity statutes will remove from circulation
such books as *Ulysses, Peyton Place, Lady Chatterly's
Lover,* nor the titillating covers in which they are pur-
veyed. And I assume that the public will continue to
be bombarded with sexual imagery in motion pictures,
on the stage, in nightclubs, in private clubs, and from
a multitude of other sources. Those who have an ap-
petite for this fare now have and will continue to have
all that they want to satisfy their hunger. Those who
eschew it are not endangered. The absence of a re-
straining statute would, I believe, add little to the
store of available stuff which the sexually inquisitive
feed upon. We are, then, telling our citizens that the
small prospect of this additional invitation to lust is
of sufficient evil to warrant the sacrifice of a part of
our rights to communicate our ideas. The cost is too
great.

Judge Learned Hand attempts to justify *Roth v.
United States,* supra, on the ground that "it is for the
legislature to determine what are the not 'imper-
missible limits' by balancing the evil of those lustful
emotions that the language may excite against de-
priving the author and his audience of the benefit
of what he has to say." Hand, The Bill of Rights
(1958). But this misses the mark in two respects.
First, it fails to recognize the fact that the courts
have not left the balancing process or the limits solely
to the legislative branch. The adjudicated cases in
the field of civil liberties clearly demonstrate that
the scope which is to be given to freedom of speech
and press is for the most part marked out by the
courts in the process of interpreting the constitutional
provisions. Second, granting that the legislature is
entitled to restrict freedom of expression when it de-

cides that competing social values predominate, the restraint is valid only if there is some ascertainable criteria by which the courts can, in specific cases, determine whether the statute is applicable. Judge Hand states that the legislature is restricted by no boundaries "other than that there shall have been an honest effort to weigh the values according to the prevalent mores." That is not an accurate statement of our constitutional law. A host of cases can be marshalled to prove that honest legislative effort is not enough to save a statute which does not meet the minimum standard of certainty set by the courts. As I have already pointed out, this standard is peculiarly high in testing legislation restricting free expression. Illustrative cases are noted below.[9]

The position taken by the majority of the court in the case at bar leaves unanswered some very important procedural questions relating to constitutional rights. When this cause is presented to the jury, will the jury's verdict conclude the matter? Will a verdict of guilty be accepted as a conclusive judgment that the constitutional guarantee of free expression does not extend to the writing under attack? If the jury

[9] Joseph Burstyn, Inc. v. Wilson, 343 US 495, 72 SC 777, 96 L Ed 1098 (1952), (New York statute proscribing showing of "sacriligeous" films held unconstitutionally vague and broad); Thomas v. Collins, 323 US 516, 534-38, 65 SC 315, 89 L Ed 430 (1945), (Texas statute requiring labor organizers to obtain organizer's card before "soliciting," held unconstitutional as blanketing with uncertainty whatever might be said); Staub v. Baxley, 355 US 313, 321-25, 78 SC 277, 2 L Ed2d 302 (1958), (city ordinance requiring a solicitor's permit which could be granted or denied by reason of "effects upon general welfare," held invalid as prior restraint); Winters v. New York, 333 US 507, 68 SC 665, 92 L Ed 840 (1948), (statute held unconstitutionally vague which had been interpreted as proscribing stories of deeds of bloodshed so massed as to incite to violent crimes); Stromberg v. Carlson, 283 US 359, 369-370, 51 SC 532, 75 L Ed 1117 (1931), (statute proscribing display of red flag "as * * * symbol * * * of opposition to organized government," held invalid as being broad enough by its terms to impinge on free expression); Herndon v. Lowry, 301 US 242, 258, 57 SC 732, 81 L Ed 1066 (1937), (statute proscribing inciting to insurrection held unconstitutionally vague and broad where "dangerous tendency" of words would be sufficient to convict).

is to have this function, must the jury be so instructed that it is made aware of its duty to consider not only the defendant's violation of the statute but to consider as well the constitutional guarantee of free expression? Will the jury, in applying the definition of obscenity adopted by the court, read the work under attack to determine whether a prurient appeal is predominant? Will other works be admissible in evidence to permit a comparison? Will expert witnesses in the fields of psychiatry, aesthetics and literary criticism be permitted to testify as to the character of the work, i.e., the author's design as manifested in the work? Will the trial judge have the right to re-examine the jury's verdict of guilty and set it aside, if he is of the opinion that constitutional rights have been invaded? Upon appeal, will we have a similar right of review?

Since the effect of the majority opinion is to remand the cause for further proceedings, these questions should be answered so that both the defendant and the trial judge will know what procedures are available to guarantee the fullest possible protection of the defendant's constitutional rights in the enforcement of the obscenity statute.

The judgment of the lower court should be affirmed.

WARNER, J. and SLOAN, J. join in this dissent.