Argued April 2, affirmed November 20, petition for rehearing
denied December 17, 1968, United States Supreme
Court denied certiorari March 24, 1969

## STATE OF OREGON, *Respondent, v.*
## HAROLD G. CHILDS, *Appellant.*
447 P. 2d 304

*Paul R. Meyer*, Portland, argued the cause for appellant. With him on the brief were Kobin & Meyer, Portland.

*Jacob B. Tanzer*, Deputy District Attorney, Portland, argued the cause for respondent. With him on the brief was George Van Hoomissen, District Attorney, Portland.

Barnes H. Ellis, Howard M. Feuerstein and John C. Wright, Portland, filed a brief for the American Civil Liberties Union of Oregon as amicus curiae.

Before PERRY, Chief Justice, and McALLISTER, SLOAN, O'CONNELL, GOODWIN, DENECKE and HOLMAN, Justices.

HOLMAN, J.

Defendant, the operator of a retail tobacco and magazine business, was convicted of selling obscene written material in violation of ORS 167.151.① The

---

① "(1) No person shall knowingly disseminate obscene matter. A person disseminates obscene matter if he exhibits, sells, delivers or provides, or offers or agrees to exhibit, sell, deliver or provide, or has in his possession with intent to exhibit, sell, deliver or provide any obscene writing, picture, motion picture, device, record, material or other representation or embodiment of the obscene.

"(2) As used in subsection (1) of this section, matter is obscene if, considered as a whole, its predominant theme appeals to prurient interest and if it is patently offensive and goes substantially beyond the customary limits of candor in describing or representing such matter with reference to ordinary persons.

"(3) In any prosecution for an offense under this section, evi-

subject of the sale was a paper-bound book entitled "Lesbian Roommate." This is an appeal from that conviction.

██ One of the defendant's principal contentions is that the material is not obscene as a matter of law and, therefore, may not be proscribed without restricting freedom in the dissemination of information in violation of the First Amendment of the United States Constitution. It is clear that obscene material does not fall within the protection of the First Amendment. *Jacobellis v. Ohio*, 378 US 184, 84 S Ct 1676, 12 L ed2d 793 (1964) ; *Roth v. United States*, 354 US 476, 77 S Ct 1304, 1 L ed2d 1498 (1957). But in determining what constitutes obscenity this court may not adopt a more inclusive definition of obscenity than the one used by the United States Supreme Court, and thus prohibit a wider range of material, without violating Federal First Amendment rights.

The United States Supreme Court has held that before material may be classified as obscene it must meet each and every one of three requirements. *Memoirs v. Massachusetts*, 383 US 413, 418, 86 S Ct 975, 16 L ed2d 1 (1966) ; *State v. Watson*, 243 Or 454, 414 P2d 337 (1966). First, the dominant theme of the material taken as a whole must appeal to a prurient in-

dence shall be admissible, as relevant to a determination of whether or not the predominant theme of the matter appeals to prurient interest, to show artistic, literary, scientific or educational merit of the matter.

"(4) In any prosecution for a violation of this section, it shall be relevant on the issue of knowledge to prove the advertising, publicity, promotion, method of handling or labeling of the matter, including any statement on the cover or back of any book or magazine.

"(5) Violation of subsection (1) of this section is punishable by imprisonment in the county jail for not more than six months, or a fine of not more than $1,000, or both."

terest in sex. Second, the material must be patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters. Third, the material must be utterly without redeeming social value.

■ With respect to the first requirement, the obvious purpose behind the book under consideration is to stimulate the reader sexually. The book is presented in a manner enticing to those seeking sexual excitement. It was openly displayed on racks in defendant's place of business. On the front page, in addition to the name of the book, there are pictured two nude young women and the words: "They slashed each other with the savagery of perverted desires. 'Beat me!' she cried." On the back cover is a waist and head photograph of a young woman with protuberant breasts clad only in a brassiere. Under the photograph is the following:

"Betty was rich and perverted. Her need for another woman's love was so great that she was willing to descend from her upper crust life to the sordidness of a cheap rented room and third rate job . . . just so she could have a lesbian roommate. But when her darling took a liking to men, Betty turned to (sic) a savage beast."

On the fly leaf is the following:

"Jill opened her mouth, felt the tongue dart inside, met it with her own. So strange. The hands squeezed her breasts. The warm thigh moved against her body, and Jill found herself wildly excited. She pushed her body against the warm thigh and returned the kiss passionately.

"The hands moved along her sides, fingers trailing lightly, and then the moist lips were on her left breast. She gasped as her erect nipple was drawn into the hot mouth, the hot tongue dancing little

circles around and around. Then Betty was doing the same thing to the right breast.

" 'I'm on fire,' Jill whispered.

"Betty raised her head. 'I'll put the fire out, honey.' "

The above-quoted material clearly demonstrates the kind of appetite to which the book is designed to appeal. The manner in which material is marketed is relevant to the determination of obscenity. In *Ginzburg v. United States,* 383 US 463, 470, 86 S Ct 942, 16 L ed2d 31 (1966), it is said:

"This evidence [evidence of the manner of marketing], in our view, was relevant in determining the ultimate question of obscenity and, in the context of this record, serves to resolve all ambiguity and doubt. The deliberate representation of petitioners' publications as erotically arousing, for example, stimulated the reader to accept them as prurient; he looks for titillation, not for saving intellectual content. Similarly, such representation would tend to force public confrontation with the potentially offensive aspects of the work; the brazenness of such an appeal heightens the offensiveness of the publications to those who are offended by such material. * * *"

The purported story includes intimate descriptions of heterosexual or homosexual acts on the average of one every ten pages. The pages are small. The print and the margins are large. The book is a series of sexual descriptions tending to, and produced solely for, the arousal of erotic sexual fantasies; it is daydream material entirely out of touch with reality. These are characteristics commonly found in obscene material. Kronhausen, Pornography and the Law (Rev ed 1964) 306. It is calculated to stimulate sex feelings independent of one's chosen partner. M. Mead, Sex and

Censorship in Contemporary Society, in New World Writings 7, 18 (3d Mentor Selection 1953). There is no doubt that the dominant theme of the material, taken as a whole, appeals to and is intended to appeal to an unusual and excessive preoccupation with sex. The entire book is for the purpose of inciting lascivious thoughts and arousing lustful desires. Roth, *supra*.

The second requirement was that the material must be patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters. Illustrative of the candor used, the book in question portrays a homosexual act between two women where one is having osculatory relations with the private parts of the other and is "greedily" making "syrupy noises." We believe material of this kind affronts national contemporary community standards.

Third, the material must be utterly without redeeming social value. We fail to discern any literary, moral or other value in the book. The supposed moral of the book is superficially inserted in the last few pages. It is obviously a sad excuse for justifying the portrayal of various kinds of sexual acts for the purpose of arousing in the reader erotic sexual fantasies. The following is found in *Ginzburg, supra*:

"* * * And the circumstances of presentation and dissemination of material are equally relevant to determining whether social importance claimed for material in the courtroom was, in the circumstances, pretense or reality—whether it was the basis upon which it was traded in the marketplace or a spurious claim for litigation purposes. Where the purveyor's sole emphasis is on the sexually provocative aspects of his publications, that fact may be decisive in the determination of obscenity. * * *"
[383 US 470]

■ We find that the material is not constitutionally protected as a matter of law. Although defendant produced expert witnesses who testified that the book had literary value, we believe the witnesses' literary glasses were rose-colored by a belief that there is no such thing as obscenity and that there should be no restrictions on freedom of expression. In fact, one of the witnesses testified as follows:

> "Q And do you put obscenity among those things that are meaningful and valuable?
> "A Let me repeat the one thing that I indicated at the very beginning. In a long time, one of the things my study has tried to show is what obscenity can mean. I do not believe that the term obscenity has any substantive meaning of its own. It is, in my view, a legal fiction. It's a label you put on something if you want to censor it."

Another expert witness testified he had never read anything which he believed to be obscene. He said that as a theoretical matter he would grant that it was possible that an obscene book could exist, but he could not conceive of such a book.

We have examined other available contemporary "pulp" books such as "Lust Pool" and "Shame Agent" which were approved in *Redrup v. New York*, 386 US 767, 87 S Ct 1414, 18 L ed2d 515 (1967), and find the book under present consideration to have been written with considerably less restraint.

■ We realize that we could construe the freedom of expression provision of the Oregon Constitution, Art. I, § 8, as providing greater freedom of expression than that of the First Amendment to the United States Constitution. We do not believe there is any legal basis for such a construction.

■ Defendant contends that the Oregon statute is unconstitutional for the same reason that its predecessor was claimed to have been so in *State v. Jackson,* 224 Or 337, 356 P2d 495 (1960). He contends that the statute is unconstitutional because it permits conviction without proof that the obscene material will perceptibly create a clear and present danger of antisocial conduct. A majority of the court rejected this contention in *Jackson* and continues to so reject it. The Supreme Court of the United States has also rejected it. See *Roth, supra.*

■ Defendant also contends that the statutory or any other definition of obscenity is so nebulous that it is impossible to determine whether any particular material is obscene and thus proscribed. Admittedly, the concept of obscenity does not lend itself to precise, mathematical definition. It is not, however, alone among imprecise terms having constitutional implications. It is hardly less precise than such terms as "clear and present danger," "probable cause," "involuntariness" and "due process," all of which are in acceptable constitutional use and equally incapable of exact definition. In *Roth* the United States Supreme Court said:

> "Many decisions have recognized that these terms of obscenity statutes are not precise. This Court, however, has consistently held that lack of precision is not itself offensive to the requirement of due process. * * *" [354 US 491]

We reject the contention that obscenity is not capable of a sufficiently precise constitutional definition.

Defendant also contends that the statute is unconstitutional because it fails to meet the Federal constitutional definition of obscenity in that it does not

expressly require "national" community standards nor does it require that the material be utterly without redeeming social importance.

It is obvious that the legislature has experienced some difficulty in keeping up with the rapidly changing United States constitutional concept of what constitutes obscenity. The present statute was enacted in 1961 and amended in 1963. A prior statute was simultaneously repealed. Legislative history and the statutory language used indicates that the 1961 enactment was for the purpose of making Oregon's statute comply with *Roth* and the 1963 amendment was to bring it up to date because of the decision in *Manual Enterprises v. Day*, 370 US 478, 82 S Ct 1432, 8 L ed2d 639 (1962).

■ We construe the statute as requiring that the standard to be applied is a national standard. It was so construed by the trial judge and the jury was so instructed.

■ We also construe the definition of obscenity in the statute to require implicitly that the material be utterly without redeeming social value. The United States Supreme Court in *Memoirs v. Massachusetts, supra,* and *Jacobellis v. Ohio, supra,* construed the *Roth* definition of obscenity to include the requirement that the material be utterly without redeeming social value. In *Memoirs* the court said as follows:

"We defined obscenity in *Roth* in the following terms: '[W]hether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest.' 354 US, at 489. *Under this definition,* as elaborated in subsequent cases, three elements must coalesce: it must be established that * * * (c) the material is utterly without redeeming social value." (Emphasis ours.) [383 US 418]

We similarly construe the Oregon statute which adopted the *Roth* definition. The trial court so construed it and instructed the jury that in order for them to find that the book in question was obscene it had to find the book to be utterly without redeeming social value.

■ Defendant also claims subsection (3) of ORS 167.151 makes the merit of the material a subject of affirmative defense rather than something for the state to disprove and therefore the statute is unconstitutional. The subsection has been construed to the contrary. See *State v. Watson*, 243 Or 454, 456, fn 2, 414 P2d 337 (1966). He also contends that the subsection makes matters of merit relevant to prurient interest, rather than a separate element of obscenity. As previously held herein, the lack of any redeeming social value is inherent in the judicial definition of obscenity adopted in *Roth* and subsequently used by the Oregon legislature in the statute.

■ Defendant also contends that subsection (4) unconstitutionally permits a presumption of scienter from the contents of the cover and back of the book. The cover and back of a book are parts of the whole. Defendant wishes to treat them as something apart. We see no justification for so considering them. Their usual purpose is to portray in a general way that part of the book between the covers for the benefit of prospective customers. A seller who displays the cover makes a representation to the public of the book's contents. Evidence of what is on the cover is therefore relevant to a seller's knowledge of the contents. His knowledge of the book's contents is relevant to whether he knows the book is obscene. The cover and back are a form of circumstantial evidence which would be rele-

vant even in the absence of a statute. A modest cover is relevant in showing that a seller was not likely to have any knowledge of obscene contents. The converse is also true. The Supreme Court of the United States has recognized that the manner in which written material is presented and sold is relevant in determining the issue of obscenity. *Ginzburg v. United States, supra.*

■ Defendant next contends that there was insufficient evidence upon which to base a conviction because the state introduced no evidence, other than the book itself, on the issue of appeal to prurient interests. Defendant argues that the average jury or judge is not competent to determine whether material of the type in question has prurient appeal. Defendant cites in support of his position *United States v. Klaw*, 350 F2d 155 (CA 2d Cir 1965), and *Dunn v. Md. Bd. of Censors*, 240 Md 249, 213 At2d 751 (1965). In *Klaw* the material was of such a bizarre nature that its prurient appeal to a normal person would be extremely doubtful in the absence of technical testimony. *Dunn* recognizes that material can have such patent prurient appeal as not to require expert testimony. However, both held that under the facts of the particular case expert testimony was necessary. This court can visualize that where it is claimed that material has prurient appeal to a deviant group, it might be necessary to have expert testimony concerning the type of material that has such appeal to that group. There is no such contention in this case. The material in question is so patently and exclusively sexual that the average trier of fact is capable of recognizing whether it would have sufficient appeal to arouse lustful desires and lascivious thoughts in the average person. The Supreme Court of the

United States has never indicated that expert testimony in this field is an absolute constitutional requirement.

■ The defendant also contends that the evidence was insufficient to permit a conviction because there was no expert testimony that the book went beyond national contemporary community standards of candor relating to the description of sexual matters and because there was no expert testimony negating any redeeming social value. He argues that the court and jury are unable to determine these matters without the benefit of expert testimony. The United States Supreme Court has not held that expert testimony of this kind is a constitutional requirement. We believe expert testimony is not required. The background and experience of the average juror would sufficiently reveal the tolerable level of candor in the contemporary national community. The time has long passed when a juror's experience was limited to the happenings and attitudes of his local community. The average juror is constantly in touch with the national scene, exposed to national publications, movies, television and radio. Every corner drug store has a book and magazine rack replete with publications distributed nationally which demonstrate the sexual candor tolerated by the public. We live in a mobile society whose freeways and airways carry people and ideas between its farthest points with great frequency and in a very short time. To say that the average juror is not cognizant of the contemporary national community and what it will tolerate is to deny the present mass dissemination of information. Under proper instructions, the jury is qualified to weigh a particular book or movie. The jury was properly instructed in this case that the

standard to be applied was that of the national community.

With respect to expert testimony on the issue of the redeeming social value of the book, we can conceive of a case where the court and jury may not be qualified to evaluate the literary value or other redeeming social value of a particular publication, and, that in such cases, expert testimony may be necessary to assist the court and jury in evaluating the material. But this is not such a case. While it is true that the author attempted to impose a superficial moral in the last few pages of the book (most likely for the purpose of colorable compliance with the United States Supreme Court's requirement), the pseudo moral does not grace the book with salvaging virtue. The book does not suggest that it has any literary or historical value whatsoever.

In addition, there was evidence in the case available to supplement the jury's knowledge of national community standards and to guide it concerning social value. The defendant himself introduced in evidence a number of books receiving judicial approval which had been highly controversial because they dealt extensively with sexual portrayals. The jury had these to compare with the book in question. They were: "Lady Chatterly's Lover," "Candy," "The Life and Loves of Frank Harris," "Tropic of Cancer," "The Group," and "Another Country." The jury was instructed by the trial court that these books could be considered by them as being within the limits of candor in the national community and that in order for defendant to be found guilty, the material in question had to be far and to a large degree beyond the limits of the community's tolerance. These books helped fill out the

jury's frame of reference relative to both limits of candor and literary value or other social benefit.

The defendant cites the case of *Dunn v. Md. Bd. of Censors, supra,* for the proposition that expert testimony is required with respect to each element of obscenity in order to comply with the Constitution. We do not recognize the *Dunn* case as properly interpreting the requirements of the Constitution. It is interesting to point out, however, that *Dunn* recognized that in some cases no expert testimony would be required when the nature of the book or film leaves no doubt as to its obscenity (213 A2d, at 754).

 Defendant also contends there was no evidence from which the jury could find that defendant knew the book was legally obscene. In order for one to be found guilty of selling an obscene book it is not necessary to prove that someone saw him read it. The following statement is found in *Smith v. California,* 361 US 147, 154, 80 S Ct 215, 4 L ed2d 205 (1959):

> "* * * Eyewitness testimony of a bookseller's perusal of a book hardly need be a necessary element in proving his awareness of its contents. The circumstances may warrant the inference that he was aware of what a book contained, despite his denial."

Also see *People v. Sikora,* 32 Ill2d 260, 204 NE2d 768, 771-882 (1965). While there was no showing that defendant had read the book, evidence of its cover and its display to the public by defendant, which have heretofore been detailed, was available to the jury and provides a permissible basis for the jury's finding that defendant knew the nature of the book's contents. There was also other evidence relevant to defendant's scienter. The officer purchasing the book testified he

prefaced the transaction by asking defendant where he kept his "dirtier" books, and that he was shown the rack from which the book in question was selected. There was testimony that the defendant told the officer that he got the worst books from out of town and they were kept in that group. After his arrest defendant told the officers he did not sell such books to persons under 18. There was sufficient evidence to support a finding of scienter.

■ Defendant claims that a retail bookseller should not be subject to prosecution because, if he is, he is required to be a censor of what the public reads. A bookseller may not put his head in the sand and claim he is an ostrich. *Smith v. California* and *People v. Sikora, supra.* This contention is equivalent to saying that a bookseller is immune from prosecution absent a prior determination of a book's obscenity. We do not believe this is or should be the law.

■ Defendant also contends that the court committed error by admitting into evidence the testimony of a police officer relative to his conversation with defendant immediately prior to defendant's arrest. Prior to this conversation the book in question had been purchased and submitted to the grand jury, an indictment had been returned and a warrant for defendant's arrest had been issued. By pre-arrangement, an officer in plain clothes preceded the arresting officer for the purpose of engaging defendant in conversation to see if any incriminating statements could be secured before he was taken into custody. It is the admission of evidence of this conversation which defendant charges was error. The state concedes that any incriminating statement secured under such circumstances would have been violative of defendant's rights to counsel

under the Sixth Amendment to the United States Constitution. *Massiah v. United States*, 377 US 201, 84 S Ct 1199, 12 L ed2d 246 (1964). The state urges, however, that the evidence was not prejudicial. The testimony was as follows:

"A * * * I asked Mr. Childs at the time if he had a book in the store by the name of—went by the title of LESBIAN ROOMMATES. Mr. Childs stated that, no, he was sold out of it. He stated that he had gotten this book in, LESBIAN ROOMMATES, at the same time he had gotten in the book BEDS OF LESBOS.

"Q Go ahead, please.

"A Mr. Childs told me that—or stated to me that he was going to have to reorder LESBIAN ROOMMATES because it was a good seller.

"He then pointed out another book in the store that went by the name of CANDY and stated that this book had been written in France and he also pointed out a book by the name of FANNY HILL which he stated was the best seller he had in the store."

We hold the testimony to be non-prejudicial. Its only possible prejudice would be as an admission that defendant stocked and sold the book. We construe defendant's opening statement as an admission that he sold the book. There was no reasonable possibility that the evidence complained of might have contributed to defendant's conviction. *Fahy v. Connecticut*, 375 US 85, 86-87, 84 S Ct 229, 11 L ed2d 171 (1963) ; *State v. Jones*, 242 Or 427, 410 P2d 219 (1966). The testimony was completely innocuous and non-prejudicial.

Defendant has many other assignments of error which we have considered and believe to be without merit.

The judgment of the trial court is affirmed.

O'CONNELL, J., dissenting.

For the reasons expressed in my dissent in *State v. Jackson*, 224 Or 337, 356 P2d 495 (1960), it is my opinion that ORS 167.151 violates Article I, § 8 of the Oregon Constitution and therefore the statute must be declared void.