Argued May 20, affirmed August 17, reconsideration denied
September 21, petition for review denied December 20, 1977

## STATE OF OREGON, *Respondent,*

### *v.*

## JOHN R. TIDYMAN, *Appellant.*

## (No. C76 05 06161, CA 6920)

568 P2d 666

[ 538 ]

J. Bradford Shiley and Marvin S. Nepom, Portland, argued the cause and filed the brief for appellant.

Al J. Laue, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief

were James A. Redden, Attorney General, and W. Michael Gillette, Solicitor General, Salem.

Before Thornton, Presiding Judge, and Tanzer and Richardson, Judges.

TANZER, J.

## TANZER, J.

This is an appeal from a judgment of conviction for disseminating obscene material in violation of ORS 167.087. The defendant makes several assignments of error.

## I.  INSUFFICIENCY OF THE SEARCH WARRANT

The defendant asserts that the affidavit for the search warrant is insufficient to allege probable cause and that the warrant does not describe the property to be seized with sufficient particularity.

A. *Allegations of Probable Cause*

The affidavit is lengthy and we summarize its allegations rather than burden these pages with its entirety. The affidavit, dated April 2, 1976, preliminarily recites that the objective of the search is to obtain evidence concerning ownership of the Star Theatre in northwest Portland. It states that a film titled "Pumpin' The Poop Chute" had been seized from the Star Theatre on March 25, 1976, and that there had been a judicial determination that there was probable cause to believe that the movie was obscene.

■ Defendant first challenges the allegation "[t]hat I have information from a confidential informant that JOHN TIDYMAN keeps and maintains records for several adult theatres in the office located at 519 NW 21 Avenue." Defendant asserts, the state concedes, and we agree that the allegation is entitled to no weight for lack of supporting allegations indicating reliability of the informant or the information. We therefore disregard it, but that is not the end of the inquiry. We have several times held that where an affidavit contains an erroneous or inaccurate allegation, its sufficiency will be measured by whether probable cause could be found from the remaining accurate allegations. *State v. Hughes,* 20 Or App 493, 532 P2d 818 (1975); *State v. Feehely,* 27 Or App 343, 556 P2d 142 (1976), *rev den* (1977); *State v. Braun,* 22

Or App 592, 540 P2d 1029 (1975). We recently applied the same rule where, as here, the allegation to be disregarded is not necessarily untruthful, but incompetent. *State v. Diaz*, 29 Or App 523, 564 P2d 1066 (1977). We therefore examine the remaining allegations for sufficiency to support a finding of probable cause.

The existence of probable cause is based on allegations which led the magistrate to three separate inferences which, read together, are sufficient.

There first appears a series of allegations from public records, handwriting analysis and other sources which lead clearly to the inference that defendant owns the Star Theatre under a fictitious name.

The affidavit then alleges that two receipts, dated February 3 and 7, 1976, made out to Tidyman Audio-Visual for electrical equipment were found during the course of the prior search of the Star Theatre. There was information from a named electrician's office that on March 31, 1976 they received a telephone request to fix some lights at the Star Theatre from a caller who gave his name and phone number. The name is verified in other allegations as an employe of the Star Theatre. The phone number is alleged to be that of Tidyman Audio-Visual, owned by the defendant, at a different northwest Portland address than the Star Theatre. Also, it was alleged that the defendant's father arrived with keys to the Star Theatre during the March 25 search, but departed and went directly to Tidyman Audio-Visual. From this information, the inference is permissible that at least some of the business of the Star Theatre is conducted from Tidyman Audio-Visual.

The affidavit further alleges that the defendant had been observed locking and unlocking the doors at the address of Tidyman Audio-Visual. The inference from these allegations and the similarity of name is that Tidyman Audio-Visual is the defendant's place of business.

■ In determining the sufficiency of an affidavit for a search warrant, we are guided by two general principles. First, we are guided by the preference of the law toward warranted rather than warrantless searches. As the United States Supreme Court has stated:

> "* * * Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants. * * *" *United States v. Ventresca,* 380 US 102, 109, 85 S Ct 741, 13 L Ed 2d 684 (1965). Quoted in *State v. Tacker,* 241 Or 597, 602, 407 P2d 851, 10 ALR3d 355 (1965).

Second, probable cause is not so much a standard of proof as it is a barrier against governmental arbitrariness. The quantum must be such as guides a reasonable person and prevents official whim. Thus, in *State v. Willis,* 24 Or App 409, 412, 545 P2d 1392, *rev den* (1976), we stated:

> "In the context of search and seizure, probable cause does not mean more likely than not, it means only a well-warranted suspicion. *State v. Keith,* 2 Or App 133, 465 P2d 724, Sup Ct *review denied* (1970). * * *"

■ The defendant contends that there is insufficient information for probable cause to believe that Star Theatre business records are at Tidyman Audio-Visual, particularly in light of the reasonable inference that such records are at the Star Theatre, which possibility is not negated in the affidavit. The fallacy of that contention is that the search warrant is not limited to business records of the Star Theatre. Rather, it is directed to business records, whether of the Star Theatre, the defendant, or any other source, pertaining to ownership of the Star Theatre.

In light of the principles stated in *Tacker* and *Willis,* we hold that the inferences that the defendant owns the Star Theatre under a false name, that some of the business of the Star Theatre is conducted from Tidyman Audio-Visual and that Tidyman Audio-

Visual is defendant's place of business, allow the reasonable conclusion that there is probable cause to believe that some business records pertaining to the ownership of the Star Theatre would be present at Tidyman Audio-Visual.

## B. *Description of Property to be Seized*

Defendant contends that the search warrant is constitutionally defective because the description of the property to be searched for and seized as "[b]usiness records pertaining to ownership of the STAR THEATRE located at 9 NW 6th Avenue" is insufficiently particular. The Fourth Amendment to the United States Constitution and Article I, Section 9 of the Oregon Constitution both require that

"* * * no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing * * * the * * * thing to be seized."

The line between what is and what is not sufficiently particular must be drawn with a view to the accomplishment of the constitutional purpose. In *Marron v. United States,* 275 US 192, 48 S Ct 74, 72 L Ed 231 (1927), in which it was held that a seizure of a ledger and bills was not proper pursuant to a search warrant for liquor and articles for the manufacture of liquor, the United States Supreme Court stated the basic purpose as follows:

"The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." 275 US at 196.

Although subsequent cases have qualified that statement, it remains a valid expression of the principle. In essence, this portion of the Fourth Amendment is a prohibition against general warrants whereby administrative officers determine what is and what is not to be seized. The decision to seize must be judicial, not administrative, and the command to seize

must be sufficiently particular to guide the officer to the thing intended to be seized and to minimize the danger of unwarranted invasion of privacy by unauthorized seizures.

■ The degree of specificity required to accomplish those purposes varies with the circumstances and with the nature of the property to be seized. LaFave, *Search and Seizure: Course of True Law,* 1966 U Ill L Rev 255, 268. Thus, in *James v. United States,* 416 F2d 467, 473 (5th Cir 1969), *cert den* 397 US 907 (1970), the court upheld the fruits of a search warrant commanding seizure of "gambling paraphernalia, including but not limited to dice, crap tables, wires, magnets, coils, solenoid switches, records, sales receipts, customers' lists, shipping orders, supplies, machine equipment, machine tools and hand tools for the manufacture of gambling paraphernalia, including but not limited to dice, crap tables," etc., stating that

"* * * [t]he place to be searched and the items to be seized were as precisely identified in the warrant as the nature of the activity permitted. When circumstances make an exact description of instrumentalities, a virtual impossibility, the searching officer can only be expected to describe the generic class of items he is seeking. * * *" 416 US at 473.

Similarly, in *United States v. Wilson,* 451 F2d 209 (5th Cir 1971), *cert den* 405 US 1032 (1972), the court upheld a warrant for the seizure of "paraphernalia for making coins." In each of these cases, the general term "paraphernalia" was modified by further description of the use for which the paraphernalia was intended.

The degree of specificity constitutionally required may also be affected by the nature of the right which is protected. In matters involving free speech and free association, a greater degree of specificity is required than otherwise. Thus, in *Stanford v. Texas,* 379 US 476, 85 S Ct 506, 13 L Ed 2d 431 (1965), the Supreme Court invalidated a search warrant commanding the seizure of "books, records, pamphlets, cards, receipts, lists, memoranda, pictures, recordings and other writ-

ten instruments concerning the Communist Party of Texas, and the operations of the Community Party in Texas," holding that the "indiscriminate sweep of that language" constituted a general warrant. 379 US at 486. Similarly, a warrant commanding seizure of "seditious matter or printing press or other machinery to print or circulate seditious matter" was not upheld in *United States v. McSurely,* 473 F2d 1178 (DC Cir 1972). Warrants calling for seizure of obscene materials have been invalidated as too general in *Marcus v. Search Warrant,* 367 US 717, 81 S Ct 1708, 6 L Ed 2d 1127 (1961), and *United States v. Marti,* 421 F2d 1263 (2nd Cir 1970), *cert den* 404 US 947 (1971), although the opinion in the latter case made it clear that the warrant would have been upheld if the officer was given some direction in the warrant as to the standards to be applied in sorting obscene from non-obscene material, such as "depiction of sexual acts." 421 F2d at 1268-69.

Business records by their nature are accorded a lesser degree of protection than that accorded to First Amendment materials. The obvious is stated in *Stanford v. Texas,* 379 US at 485, n. 16:

> "The word 'books' in the context of a phrase like 'books and records' has of course, a quite different meaning. A 'book' which is no more than a ledger of an unlawful enterprise thus might stand on a quite different constitutional footing from the books involved in the present case. * * *"

■ The difference in the nature of stolen property and of business records causes a difference in the requisite degree of specificity for the seizure of each. Stolen goods, because they were once in another's possession and are likely to have been described in stolen property reports, are by their nature more capable of specific description than business records. The difference is illustrated in *United States v. Scharfman,* 448 F2d 1352 (2nd Cir 1971), *cert den* 405 US 919 (1972), in which two related warrants were upheld. The first described "fur coats, stoles, jackets and other finished

[ 544 ]

fur products, books, records, and other fruits and instrumentalities." The second warrant described "the property specified [furs] and for such books and records as are being used as means and instrumentalities of the above described crimes." The court held that the limitation in the warrant on the seizure of business records to those which related to the crime was a sufficient direction to the officer to assure that he would be able to stay within the bounds of judicial warrant. Otherwise stated, a general description of goods to be seized is valid if qualified by a standard by which to sort the goods to be seized from the general mass of goods described.

The same principle seems applicable to evidence, such as that seized in this case, indicating proprietary interest. Thus, in *United States v. Honore,* 450 F2d 31, 33 (9th Cir 1971), *cert den* 404 US 1048 (1972), a search warrant was upheld which commanded the seizure of specifically described articles of stolen property "and articles [of] personal property tending to establish the identify [sic] of the persons in control of the premises, storage areas or containers where the above-listed property are located, consisting in part of and including but not limited to utility company receipts, rent receipts, cancelled mail, envelopes, and keys."

■ The principles of these cases elaborating on *Marron v. United States,* 275 US 192, 48 S Ct 74, 72 L Ed 231 (1927), apply readily to the description in this warrant. Where the search is for business records generally, as opposed to a specific record, a general description is often all that is possible due to the general nature of the documentary evidence sought. Indeed, in this case, it is evident that the business records are sought as much to prove their situation at defendant's office as for their content. The common resort to the phrase "including but not limited to" and a list of common types of business records, adds negligible definitional particularity to the phrase "business records," and this

warrant is not insufficient for lack of that illusory limitation.

On the other hand, the use of the limiting phrase "pertaining to the ownership of the STAR THEATRE" gives judicial direction to the officer as to what among the general class of "business records" is to be seized and what is to be left, in the same way that "for making coins" and "gambling" limits "paraphernalia" in *United States v. Wilson,* 451 F2d 209 (5th Cir 1971), *cert den* 405 US 1032 (1972), and *James v. United States,* 416 F2d 467 (5th Cir 1969), *cert den* 397 US 907 (1970), "tending to establish the identity of the persons in control of the premises" limits "articles [of] personal property" in *Honore,* and "as are being used as means and instrumentalities of [theft of fur articles]" limits "such books and records" in *United States v. Scharfman,* 448 F2d 1352 (2nd Cir 1971), *cert den* 405 US 919 (1972).

Therefore we conclude that the description of the items to be seized was sufficiently particular to satisfy constitutional muster because the general description of items of a nature which are often not specifically describable was sufficiently limited by a statement of a standard by which the executing officer could readily identify the items to be seized under the warrant and leave those which were not to be seized.

■ Defendant makes much of the extensive search which was made pursuant to the warrant. The record contains indications that the officers may have exceeded their authority under the warrant in the course of the search, however we need not reach that conclusion. The assignment of error refers to the particularity of the warrant, not the scope or intensity of the search. The warrant was either particular or general as of the moment it was signed and that which followed did not affect its validity. If the officers exceeded the scope of search or seizure authorized by the warrant, then defendant should seek exclusion of property seized beyond the scope of the authorization

of the warrant, *State v. Hawkins,* 255 Or 39, 463 P2d 858 (1970), or pursue a civil remedy. The papers seized pursuant to the warrant in this case and introduced in evidence all pertain to the ownership of the Star Theatre and were not the result of a search in excess of the authorization of the warrant.

Therefore the warrant was valid in all respects and the motion to suppress the evidence seized pursuant to it was properly denied.

## II. EXHIBITION OF COMPARABLE MATERIALS

■ The defendant sought to introduce as evidence and have exhibited before the jury two films, "Deep Throat" and "It Happened in Hollywood." He assigns as error the trial court's exclusion of that evidence.[1] Defendant introduced expert testimony of a film critic that the proffered films were within the contemporary community standard of candor. He contends that the two films are comparable to the subject film in this prosecution in that all involve the explicit depiction of sexual activity. Therefore, he argues, the films should have been admitted in order to provide the jury with a framework within which to determine whether the subject film complies with the contemporary community standard.

The concept of "contemporary community standard," taken literally, is exceedingly difficult to apply. The difficulty arises from the anomoly that the very purpose of the First Amendment is to protect expression which fails to conform to community standards. Yet the United States Supreme Court has doggedly adhered to this aspect of the *Roth*[2] formula for the detection of obscenity. In *Miller v. California,* 413

---

[1] Neither of the two proffered films were made a part of the record on appeal. At trial, defendant's offer of proof consisted of a description of the content of the films. The trial court's decision to exclude the evidence was based solely upon that description as is our decision herein.

[2] *Roth v. United States,* 354 US 476, 77 S Ct 1304, 1 L Ed 2d 1498 (1957).

US 15, 93 S Ct 2607, 37 L Ed 2d 419 (1973), the court reaffirmed its commitment to the concept, but required that this federally guaranteed right conform in each case to the dimensions of the standard of the local community, however local that may be.

Defendant's theory that community standards are susceptible to expert proof, complete with illustrative evidence, has some support elsewhere, *see,* e.g., *United States v. Manarite,* 448 F2d 583 (2nd Cir), *cert den* 404 US 947 (1971); *United States v. Jacobs,* 433 F2d 932 (9th Cir 1970); *Womack v. United States,* 294 F2d 204 (DC Cir), *cert den* 365 US 859 (1961), but the Supreme Court of Oregon has taken a narrower, more realistic view. In *State v. Childs,* 252 Or 91, 104-105, 447 P2d 304 (1968), *cert den* 394 US 931 (1969), it held that juries are capable of discerning community standards without expert assistance. The court reasoned:

> "The defendant also contends that the evidence was insufficient to permit a conviction because there was no expert testimony that the book went beyond national contemporary community standards of candor relating to the description of sexual matters and because there was no expert testimony negating any redeeming social value. He argues that the court and jury are unable to determine these matters without the benefit of expert testimony. The Unites States Supreme Court has not held that expert testimony of this kind is a constitutional requirement. We believe expert testimony is not required. The background and experience of the average juror would sufficiently reveal the tolerable level of candor in the contemporary national community. The time has long passed when a juror's experience was limited to the happenings and attitudes of his local community. The average juror is constantly in touch with the national scene, exposed to national publications, movies, television and radio. Every corner drug store has a book and magazine rack replete with publications distributed nationally which demonstrate the sexual candor tolerated by the public. We live in a mobile society whose freeways and airways carry people and ideas between its farthest points with great frequency and in a very short time. To say that the average juror is

not cognizant of the contemporary national community and what it will tolerate is to deny the present mass dissemination of information. Under proper instructions, the jury is qualified to weigh a particular book or movie. The jury was properly instructed in this case that the standard to be applied was that of the national community."

That reasoning is all the more compelling now that the community standard to be applied is local rather than national. It is further strengthened by the United States Supreme Court's continuing references to the *Roth* criteria as "basic guidelines for the trier of fact," *Ward v. Illinois,* 431 US 767, 97 S Ct 2085, 52 L Ed 2d 738 (1977), rather than as objective forensic standards. The phrase implies reliance upon the jurors' innate sensitivity to community standards at the time and place of their decision, *Miller v. California,* supra.[3]

In view of the commonsense analysis in *Childs,* and the long-standing rule that expert testimony is not allowed to prove matters within common experience, *State v. Anderson,* 10 Or 448, 455-56 (1882), it is questionable whether expert testimony is admissible in any but extraordinary obscenity cases, but that issue is not presented. The issue is whether so-called "comparison" films were necessarily admissible as illustrative of the expert witness' description of community standards of candor.[4]

---

[3] In this respect it appears that, in its perservering attempt to define obscenity, the Supreme Court has finally adopted the theory first articulated by Learned Hand in *United States v. Kennerley,* 209 F 119, 121 (SD NY 1913):

"If there be no abstract definition * * * should not the word 'obscene' be allowed to indicate the present critical point in the compromise between candor and shame at which the community may have arrived here and now?"

[4] In *State v. Childs,* 252 Or 91, 105, 447 P2d 304 (1968), *cert den* 394 US 931 (1969), the court noted that some books which had received "judicial approval" were submitted to the jury for comparison, but it did not hold that such evidence was to be admitted in all cases. We take "judicial approval" to refer to decisions of law, not mere nonprosecution or failure of juries to convict.

The idea of submission of "comparison" films or books to the jury is inherently faulty, for submission implies or would likely be perceived as implying a judicial determination that the materials are not obscene as a matter of law. By submission, the court implicitly invites the jury to use the comparison materials as a judicially authorized litmus test for obscenity, when the decision is simply not that objective in nature. Such evidence has enormous potential for confusion.

The admission of such evidence should be treated like that of any other evidence illustrative of the testimony of an expert, subject to the broad discretion of the trial court, *Carnine v. Tibbetts,* 158 Or 21, 36, 74 P2d 974 (1937). Here, the exercise of discretion was based on the degree of dissimilarity of the proffered films to "Pumpin' The Poop Chute." We find no abuse where discretion was calculated to maintain the focus of jury consideration on the film in issue and to avoid confusion, diffusion and diversion.

### III. EVIDENCE OF APPEAL TO PRURIENT INTEREST

Defendant contends that the trial court erred in denying his motion for judgment of acquittal on the ground that there was insufficient evidence that the subject film appealed to anyone's prurient interest. The film depicted defecation during the act of sexual intercourse. ORS 167.087 requires that in order for material to be found obscene the trier of fact must find that:

> "The average person applying contemporary state standards would find the work, taken as a whole, appeals to the prurient interest in sex * * *."

In *Mishkin v. New York,* 383 US 502, 16 L Ed 2d 56, 86 S Ct 958 (1966), the Supreme Court held that material may be obscene if it appeals to the prurient interest of members of a deviant group even if it does not appeal to the prurient interest of the average person. ORS 167.087 encompasses the *Mishkin* rule.

The statute requires that an average person would find appeal to someone's prurient interest; it does not require prurient appeal to the average fact finder.

Defendant argues that the jury could not reasonably be expected to determine that the depicted activity appeals to the prurient interest of a deviant group, coprophiliacs,[5] without the benefit of expert testimony and, because there was no such testimony on this point, there was a failure of proof.

■ Generally, a jury is capable of discerning the prurient appeal of allegedly obscene materials solely on the basis of the materials themselves. Expert testimony is not required. *Paris Adult Theatre I v. Slaton,* 413 US 49, 93 S Ct 2628, 37 L Ed 2d 446 (1973). Nor is such testimony desirable in the usual case. The jury's determination is based on common sense and innate sensibilities. The efforts of experts to alter that determination are almost certainly destined to fail. *See,* McGaffey, *A Realistic Look at Expert Witnesses in Obscenity Cases,* 69 NW Univ L Rev 219 (1974). As the Supreme Court noted in *Paris Adult Theatre I v. Slaton,* 413 US at 56, n 6:

> "* * * [Expert] testimony is usually admitted for the purpose of explaining to lay jurors what they otherwise could not understand. No such assistance is needed by jurors in obscenity cases; indeed, the 'expert witness' practices employed in these cases have often made a mockery out of the otherwise sound concept of expert testimony." (Citation omitted.)

■ Defendant relies, however, on the court's suggestion in the *Paris Adult Theatre* case that expert testimony may be necessary "where contested materials are directed at such a bizarre deviant group that the experience of the trier of fact would be plainly inadequate to judge whether the materials appeal to the prurient interest." 413 US at 56, n 6. This is not such a case. In *Miller v. California,* 413 US at 25, the

---

[5]Coprophilia is a marked interest in feces, especially the use of feces for sexual excitement. Webster's Third New International Dictionary (1969).

court included, in its list of "plain examples" of regulable conduct, "[p]atently offensive representations or descriptions of * * * excretory functions. * * *" It is difficult to perceive how material which the Supreme Court considers plainly subject to regulation could be so foreign to the jury that an expert would be needed to explain its purpose. A jury, relying on common sophistication, is able to determine whether the subject matter of the contested film would appeal to the prurient interest of a deviant group, particularly where, as here, the deviant behavior is presented in a context of sexual activity.

## IV.  REMAINING ASSIGNMENTS OF ERROR

Defendant's remaining assignments of error are either without substance or without prejudice. It would serve no purpose to discuss them at length herein and we therefore treat them summarily.

### A. *Hearsay Statements of Defendant's Employes*

Defendant contends that the trial court erred in allowing a police officer to testify, over defense objections, as to statements made to him by three of defendant's employes.

The first such statement was made at the time the film was seized from the Star Theatre. The declarant was the only person then on duty at the theatre. At trial, the police officer recounted his conversation with the employe as follows:

"I questioned Mr. Sparks about his employment at the Star Theater. He stated to me that he had a roommate who worked at a nearby Flick Theater on NW Broadway. He said one evening his roommate took him to the Flick Theater, showed him how to run the projector at the Flick. A short while later he received a phone call that asked him if he would like to come to work at the Star Theater. He stated the caller did not identify himself. All they did was tell him when to work. He never met a boss, never filled out an application. He worked there for approximately two weeks before this seizure. He stated that his paychecks were there Thurs-

day morning. He didn't know who brought them in or who he was working for.

"I further asked him about ownership of the theater and he stated that all he knew, or all he understood, was that the owner of the Star Theater owned several other theaters. He further told me that he was instructed that if he were to be arrested that he was to call the company lawyer, Mr. Nepom, and to give only his name and address and date of birth to the police."

It appears that the foregoing testimony is hearsay not within any apparent exception. We conclude, however, that its admission, if error, was harmless. The only probative force is as evidence of attempted concealment of defendant's ownership of the theatre, suggesting his consciousness of guilt. There was ample documentary evidence which established both the fact of defendant's ownership and his efforts to conceal it. Defendant presented no contradictory evidence. Therefore, it is highly unlikely that exclusion of the testimony would have affected the jury's decision. *See, State v. Van Hooser,* 266 Or 19, 511 P2d 359 (1973).

The two other challenged statements were made by employes when they were served with Grand Jury subpoenas. The police officer testified that both employes told him that they worked for defendant. Assuming that both statements were inadmissible hearsay, defendant was not prejudiced by their admission, because both declarants testified at trial that they were employed by defendant. *See, State v. Van Hooser, supra.*

B. *Hostile Witnesses*

Defendant argues that the trial court erred in declaring two of defendant's employes to be hostile state witnesses, thereby permitting their direct examination by leading questions. ORS 45.560. Such a determination is within the discretion of the trial court and will not be set aside unless it amounted to or contributed to the denial of a fair trial. *Sinclair v. Barker,* 236 Or 599, 608, 390 P2d 321 (1964); *see also*

McCormick, Evidence, 9, § 6 (2d ed E. Cleary 1972). We hold that in this case it did not.

## C. *Instruction on Disputable Presumptions*

■ Over defendant's objection, the trial court instructed the jury on disputable presumptions in essentially the words of the statute, ORS 41.360, and therefore absent a constitutional challenge, it was permissible.

## D. *Constitutionality of ORS 167.087*

■ Finally, defendant contends that Oregon's obscenity statute, ORS 167.087, is unconstitutionally vague and overbroad. This writer, not joined by his colleagues, would concur if controlling law were not settled otherwise. We therefore adhere to our prior decision to the contrary. *Film Follies, Inc. v. Haas,* 22 Or App 365, 539 P2d 669, *rev den* (1975), *appeal dismissed* 426 US 913, 96 S Ct 2617, 49 L Ed 2d 368 (1976).

Affirmed.